1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

YACOB CHERNET, derivatively on behalf of EHEALTH, INC.,

      Plaintiff,

      v.

SCOTT N. FLANDERS, DEREK N. YUNG, DAVID K. FRANCIS, ANDREA C. BRIMMER, BETH A. BROOKE, MICHAEL D. GOLDBERG, RANDALL S. LIVINGSTON, JACK L. OLIVER, III, and DALE B. WOLF,

      Defendants,

      and

EHEALTH, INC.,

      Nominal Defendant.

Case No.:   20-cv-04477

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Yacob Chernet ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant eHealth, Inc. ("eHealth" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Scott N. Flanders, Derek N. Yung, David K. Francis, Andrea C. Brimmer, Beth A. Brooke, Michael D. Goldberg, Randall S. Livingston, Jack L. Oliver, III, and Dale B. Wolf (collectively, the "Individual Defendants," and together with eHealth, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of eHealth, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding eHealth, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by eHealth's directors and officers from March 19, 2018 through the present (the "Relevant Period").

2.      eHealth is a health insurance marketplace that provides a technology and service platform that offers consumer engagements, education, and health insurance enrollment solutions. The Company's marketplace sells health insurance products from over 180 health insurance carriers across the United States.

3.      On January 1, 2018, the Company started recognizing its revenue under Accounting Standards Update 2014-09, *Revenue from Contracts with Customers*, known as "ASC 606." Following

its adoption of ASC 606, the Company began preemptively recognizing revenue based on projected estimates attached to enrollees' purported membership lifetimes utilized in eHealth's long-term value ("LTV") models.

4.     The Company's highly aggressive estimates successfully disguised the true profitability of eHealth. To the investing public, eHealth's growth had skyrocketed over the last two years, with record-breaking numbers of enrollees and promising operating results. Yet, along with the explosive growth came a significant increase in the rates of membership churn, i.e. the rate at which enrollees switched or otherwise abandoned their health care plans.

5.     The Company's stock price rose in tandem, reaching a high of $152.19 per share during the Relevant Period.

6.     However, the key driver of eHealth's growth since at least 2018, has been the Company's reliance on "direct response" advertising, a type of advertising designed to prompt immediate action. Enrollees acquired through direct response advertising are high churn and resultingly unprofitable. The increasing usage of direct response advertising allowed eHealth's enrollees to soar during the Relevant Period. At the same time, the Company continued to calculate membership life assumptions with results experienced in 2017—before the composition of its membership—and their churn rates—drastically changed. The Individual Defendants' deliberate manipulation of the Company's growth and prospects enabled them to artificially inflate the price of eHealth common stock and dump their shares for excessive profits.

7.     Throughout the Relevant Period, the Individual Defendants misleadingly downplayed costs associated with retaining enrollees, while overstating the estimated lifetime and future commissions to be received by enrollees. The combined result presented a faulty image of steady growth and solid membership for the Company. At the same time, the Company's management has continuously failed to reach positive cash flows, despite purported expectations to the contrary.

8.     The truth emerged prior to the market opening on April 8, 2020, when an online research publication, Muddy Waters Research ("Muddy Waters"), published a report (the "Muddy Waters Report") that stated, "[eHealth's] highly aggressive accounting masks what we believe is a significantly

unprofitable business."[1] The report pointed out that the Company's LTV persistence assumptions seemed highly aggressive against the reality of the Company's operations, skyrocketing churn rates, and reliance on "Direct Response television advertising." The report further concluded that "[eHealth] is pursuing low quality, lossmaking growth while its LTVs are based on lower churn, pre-growth cohorts." According to the Muddy Waters Report, "[t]o generate [its] unprofitable growth, [eHealth] has been incinerating cash, which we expect it to continue to do until this value destruction slows down or stops. [eHealth] *management is, in our view, running a massive stock promotion*." (Emphasis added).

9.      On this news, the Company's stock price fell over 12%, from closing at $116.90 per share on April 7, 2020, to close at $103.20 per share on April 8, 2020.

10.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or allowed certain of the Individual Defendants to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) eHealth utilized accounting techniques that were highly aggressive and overstated membership lifetime modeling assumptions; (ii) the Company depended on direct response television advertising as its primary marketing tool, which attracts droves of high churn enrollees who are unprofitable; (iii) because the Company began pursuing growth that was low quality and uneconomic, the rate of eHealth membership churns sharply climbed from 2017; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

---

[1]  http://d.muddywatersresearch.com/content/uploads/2020/04/MW_EHTH_04082020.pdf.  Last  visited May 27, 2020.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.  Upon information and belief, 18,656 shares of the Company's common stock were repurchased at inflated prices during the Relevant Period.[2]  Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the stock was artificially inflated, netting proceeds of over $32.4 million collectively.

14.     In light of the Individual Defendants' misconduct, which has subjected eHealth, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Operating Officer ("COO") to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's, and COO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of eHealth's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[2] As of this date, the Company has not disclosed the price it paid per share for these repurchases.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78t), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.    Venue is proper in this District because eHealth and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of eHealth common stock. Plaintiff has continuously held eHealth common stock at all relevant times. Plaintiff is a citizen of the State of Indiana.

Verified Shareholder Derivative Complaint

**Nominal Defendant eHealth**

24.     Nominal Defendant eHealth is a Delaware corporation with its principal executive offices at 2625 Augustine Drive, Second Floor, Santa Clara, California 95054. eHealth's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "EHTH."

**Defendant Flanders**

25.     Defendant Scott N. Flanders ("Flanders") has served as the Company's CEO since May 2016 and as a Company director since February 2008. According to the Company's Schedule 14A filed with the SEC on April 28, 2020 (the "2020 Proxy Statement"), as of March 31, 2020, Defendant Flanders beneficially owned 849,758 shares of the Company's common stock, which represented 3.2% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Flanders owned approximately $119.6 million worth of eHealth stock.

26.     For the fiscal year ended December 31, 2019, Defendant Flanders received $9,798,119 in compensation from the Company. This included $600,000 in salary, $8,064,027 in stock awards, $1,125,000 in Non-Equity Incentive Plan compensation and $9,092 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Flanders received $3,498,356 in compensation from the Company. This included $600,000 in salary, $2,064,856 in stock awards, $828,000 in Non-Equity Incentive Plan compensation and $5,500 in all other compensation.

27.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Flanders made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| January 24, 2020 | 89,278 | $113.81 | $ 10,160,729.18 |
| January 22, 2020 | 31,722 | $100.28 | $  3,181,082.16 |
| July 30, 2019 | 99,516 | $104.15 | $ 10,364,591.40 |
| May 10, 2019 | 34,005 | $ 61.40 | $  2,087,907.00 |

Thus, in total, before the fraud was exposed, he sold 254,521 Company shares on inside information, for which he received approximately $25.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

28.     The Company's 2020 Proxy Statement stated the following about Defendant Flanders:

Scott N. Flanders. Chief Executive Officer and Director. Scott Flanders has served as our chief executive officer since May 2016 and as a member of our board of directors since February 2008. Prior to becoming our chief executive officer, Mr. Flanders served as the chief executive officer of Playboy Enterprises, Inc., a media and lifestyle company, from July 2009 to May 2016, and as a member of its board of directors from July 2009 to December 2019. Previously, Mr. Flanders served as the president and chief executive officer of Freedom Communications, Inc., a privately-owned media company, from January 2006 to June 2009, and as a member of its board of directors from 2001 to 2009. From 1999 to July 2005, Mr. Flanders served as the chairman and chief executive officer of Columbia House Company, a direct marketer of music and video products, which was acquired by Bertelsmann AG in July 2005. Mr. Flanders holds a B.A. degree in economics from the University of Colorado and a J.D. from Indiana University. He is also a certified public accountant. Mr. Flanders brings to our board of directors substantial management and operational expertise as a result of his experience as our chief executive officer, his leadership of several large media companies and his background in law and accounting, all of which are relevant to our overall business.

29.     Upon information and belief, Defendant Flanders is a citizen of the State of California.

**Defendant Yung**

30.     Defendant Derek N. Yung ("Yung") has served as the Company's senior vice president and CFO since June 2018. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Yung beneficially owned 82,908 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Yung owned approximately $11.6 million worth of eHealth stock.

31.     For the fiscal year ended December 31, 2019, Defendant Yung received $4,710,948 in compensation from the Company. This included $369,271 in salary, $4,004,177 in stock awards, and $337,500 in Non-Equity Incentive Plan compensation. For the fiscal year ended December 31, 2018, Defendant Yung received $2,680,219 in compensation from the Company. This included $188,462 in

salary, $1,158,875 in stock awards, $1,089,113 in option awards, $243,500 in Non-Equity Incentive Plan compensation, and $269 in all other compensation.

32.     The Company's 2020 Proxy Statement stated the following about Defendant Yung:

*Derek N. Yung. Senior Vice President, Chief Financial Officer.* Derek Yung has served as our senior vice president, chief financial officer since June 2018. Prior to joining us, Mr. Yung served as chief financial officer of Hotwire, Inc., a travel services company owned by Expedia, Inc., from January 2016 to May 2018. From August 2015 to January 2016, he served as chief financial officer of Ticketfly, Inc., a live-events ticketing company. Previously, Mr. Yung served as chief financial officer of Tria Beauty, Inc., a consumer skincare company, from January 2014 to March 2015 and as chief financial officer of Nextag, Inc., a comparison shopping and e-commerce services company, from January 2011 to January 2014. Mr. Yung holds a B.S. degree in computer science from Stanford University and an M.B.A from the Kellogg School of Management at Northwestern University.

33.     Upon information and belief, Defendant Yung is a citizen of the State of California.

**Defendant Francis**

34.     Defendant David K. Francis ("Francis") has served as the Company's COO since January 2018. He also served as eHealth's CFO between July 2016 and June 2018. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Francis beneficially owned 180,615 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Francis owned approximately $25.4 million worth of eHealth stock.

35.     For the fiscal year ended December 31, 2019, Defendant Francis received $5,745,848 in compensation from the Company. This included $438,461 in salary, $4,902,387 in stock awards, and $405,000 in Non-Equity Incentive Plan compensation. For the fiscal year ended December 31, 2018, Defendant Francis received $1,726,416 in compensation from the Company. This included $400,000 in salary, $913,362 in stock awards, $395,000 in Non-Equity Incentive Plan compensation, and $18,054 in all other compensation.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Francis made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| August 12, 2019 | 2,000 | $109.53 | $      219,060.00 |
| July 30, 2019 | 1,000 | $103.00 | $      103,000.00 |

Thus, in total, before the fraud was exposed, he sold 3,000 Company shares on inside information, for which he received approximately $322,060. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's 2020 Proxy Statement stated the following about Defendant Francis:

*David K. Francis. Chief Operating Officer.* David Francis has served as our chief operating officer since January 2018. Mr. Francis previously served as our chief financial officer between July 2016 and June 2018 and as our chief operations officer from October 2016 to January 2018. Prior to joining us, Mr. Francis served as managing director, equity research at RBC Capital Markets from November 2013 to July 2016. From 2007 to October 2013, he served as managing partner of The JAAG Group/JAAG Research, healthcare and technology consulting and research firms founded by Mr. Francis. Previously, Mr. Francis was a managing director and co-head of Healthcare Equity Research at Jefferies & Co., a partner, equity research at JC Bradford & Co., a managing director, equity research at Volpe Brown Whelan, a managing director at Punk, Ziegel & Knoell and an investment banking analyst at Needham & Company. Mr. Francis holds a B.S. degree in economics with concentrations in finance and management from the Wharton School of the University of Pennsylvania.

38.     Upon information and belief, Defendant Francis is a citizen of the State of California.

**Defendant Brimmer**

39.     Defendant Andrea C. Brimmer ("Brimmer") has served as a Company director since December 2018. She also serves as a member of the Company's Compensation Committee, Nominating and Corporate Governance Committee, and Strategy Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Brimmer beneficially owned 1,016 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Brimmer owned approximately $143,073 worth of eHealth stock.

40.     For the fiscal year ended December 31, 2019, Defendant Brimmer received $205,073 in compensation from the Company. This included $50,000 in fees earned in cash and $155,073 in stock awards. For the fiscal year ended December 31, 2018, Defendant Brimmer received $147,754 in compensation from the Company, all in the form of stock awards.

41.     The Company's 2020 Proxy Statement stated the following about Defendant Brimmer:

*Andrea C. Brimmer. Director.* Andrea Brimmer has served as a director since December 2018. Ms. Brimmer has served as enterprise chief marketing and public relations officer of Ally Financial Inc., a leading digital financial services company, since May 2015. Ms. Brimmer served as chief marketing officer of Ally Auto from 2010 to January 2015 and as marketing executive from 2007 to 2010. From 1988 to 2007, Ms. Brimmer held various marketing, business development and public relations positions at an advertising agency, Campbell-Ewald Advertising, including as executive vice president and account director. Ms. Brimmer holds a B.A. in advertising from Michigan State University. Ms. Brimmer brings to our board of directors her expertise in marketing, public relations and business development acquired in the course of serving as the chief marketing officer of a leading digital financial services company and as an executive at an advertising agency.

42.     Upon information and belief, Defendant Brimmer is a citizen of the State of Michigan.

**Defendant Brooke**

43.     Defendant Beth A. Brooke ("Brooke") has served as a Company director since August 2019. She also serves as a member of the Company's Audit Committee, Government and Regulatory Affairs Committee, and Strategy Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Brooke beneficially owned 1,000 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Brimmer owned approximately $140,820 worth of eHealth stock.

44.     For the fiscal year ended December 31, 2019, Defendant Brooke received $161,458 in compensation from the Company. This included $26,875 in fees earned in cash and $134,583 in stock awards.

45.     The Company's 2020 Proxy Statement stated the following about Defendant Brooke:

*Beth A. Brooke. Director.* Beth Brooke has served as a director since August 2019. Ms. Brooke served as the global vice chair of public policy for EY (formerly Ernst & Young), a global professional services network, from 2007 to June 2019, and as EY Americas'

vice chair of public policy, sustainability and stakeholder engagement from 2001 to 2007. Ms. Brooke also held various roles in strategy, corporate development and tax practice management at EY from 1981 to 2001. During the Clinton administration, Ms. Brooke served in the U.S. Department of the Treasury and was responsible for tax policy matters related to insurance and managed care, including working on healthcare and superfund legislative reform efforts. She holds a B.S. degree in industrial management/computer science with highest distinction from Purdue University, where she played intercollegiate basketball, and is a certified public accountant. Ms. Brooke brings to our board of directors extensive knowledge of accounting and policy matters from over thirty years of service at EY and as a prominent, trusted voice on public policy matters for the accounting and auditing profession and has extensive strategy, corporate development and executive management expertise.

46.     Upon information and belief, Defendant Brooke is a citizen of the State of Pennsylvania.

**Defendant Goldberg**

47.     Defendant Michael D. Goldberg ("Goldberg") has served as a Company director since June 1999. He also serves as a member of the Company's Audit Committee and as chairperson of the Strategy Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Goldberg beneficially owned 87,386 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Goldberg owned approximately $12.3 million worth of eHealth stock.

48.     For the fiscal year ended December 31, 2019, Defendant Goldberg received $220,698 in compensation from the Company. This included $65,625 in fees earned in cash and $155,073 in stock awards. For the fiscal year ended December 31, 2018, Defendant Goldberg received $227,928 in compensation from the Company. This included $62,500 in fees earned in cash and $165,428 in stock awards.

49.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Goldberg made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| August 23, 2019 | 11,104 | $ 99.04 | $   1,099,740.16 |
| August 22, 2019 | 7,013 | $102.15 | $      716,377.95 |
| August 21, 2019 | 4,057 | $102.21 | $      414,665.97 |
| May 30, 2019 | 8,750 | $ 70.00 | $      612,500.00 |

| May 8, 2019 | 7,500 | $ 63.49 | $ 476,175.00 |
| March 5, 2019 | 2,337 | $ 58.00 | $ 135,546.00 |

Thus, in total, before the fraud was exposed, he sold 40,761 Company shares on inside information, for which he received approximately $3.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

50.     The Company's 2020 Proxy Statement stated the following about Defendant Goldberg:

*Michael D. Goldberg. Director.* Michael Goldberg has served as a director since June 1999. Mr. Goldberg has served as the executive chairman of DNAnexus, Inc., a cloud-based genomic data company, and as an advisor at other private life science companies since May 2011. From January 2005 to May 2011, Mr. Goldberg was a partner at Mohr Davidow Ventures, a venture capital firm. From October 2000 to December 2004, Mr. Goldberg served as a managing director of Jasper Capital, a management and financial consultancy business. In 1995, Mr. Goldberg founded OnCare, Inc., an oncology practice management company, and served as its chief executive officer until March 1999 and as its chairman until August 2001. Mr. Goldberg previously served as founder, president and chief executive officer of Axion, Inc., a cancer-focused healthcare service company, from 1987 to 1995. Mr. Goldberg holds a B.A. in philosophy from Brandeis University and an M.B.A from the Stanford Graduate School of Business. Mr. Goldberg serves as the chairman of the board of directors of CareDx, Inc. Mr. Goldberg brings to our board of directors his broad background as a seasoned entrepreneur, senior executive and as a venture capital investor focusing on healthcare-related industries, all of which has provided him with deep understanding of the healthcare field and significant experience overseeing corporate strategy, assessing operating strategy and evaluating business management teams.

51.     Upon information and belief, Defendant Goldberg is a citizen of the State of California.

**Defendant Livingston**

52.     Defendant Randall S. Livingston ("Livingston") has served as a Company director since December 2008. He also serves as a member of the Company's Audit Committee and Government and Regulatory Affairs Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Livingston beneficially owned 49,704 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Livingston owned approximately $6.9 million worth of eHealth stock.

53.     For the fiscal year ended December 31, 2019, Defendant Livingston received $222,698 in compensation from the Company. This included $67,625 in fees earned in cash and $155,073 in stock

awards. For the fiscal year ended December 31, 2018, Defendant Livingston received $228,928 in compensation from the Company. This included $63,500 in fees earned in cash and $165,428 in stock awards.

54.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Livingston made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| August 1, 2019 | 15,000 | $103.18 | $  1,547,700.00 |
| August 1, 2018 | 20,750 | $  25.00 | $     518,750.00 |

Thus, in total, before the fraud was exposed, he sold 35,750 Company shares on inside information, for which he received approximately $2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

55.     The Company's 2020 Proxy Statement stated the following about Defendant Livingston:

*Randall S. Livingston. Director.* Randall Livingston has served as a director since December 2008. Mr. Livingston has served as vice president for business affairs and chief financial officer of Stanford University since 2001 and as university liaison for Stanford Medicine and a board member of Stanford Health Care and Lucile Packard Children's Hospital Stanford since October 2017. From 1999 to 2001, Mr. Livingston served as executive vice president and chief financial officer of OpenTV Corp., a provider of interactive television software and services. Mr. Livingston received a B.S. in mechanical engineering from Stanford University and an M.B.A. from the Stanford Graduate School of Business. Mr. Livingston serves as a member of the board of directors of Pacific Biosciences, Inc. and previously served as a member of the board of directors of Genomic Health, Inc. from 2004 to 2016. Mr. Livingston brings to our board of directors substantial financial expertise that includes extensive knowledge of the financial and operational issues facing large companies acquired in the course of serving as the chief financial officer of a major university, as a finance executive for several Silicon Valley companies and working with a major international management consulting firm.

56.     Upon information and belief, Defendant Livingston is a citizen of the State of California.

**Defendant Oliver**

57.     Defendant Jack L. Oliver, III ("Oliver") has served as a Company director since December 2005. He also serves as a member of the Company's Compensation Committee and Government and Regulatory Affairs Committee, and as chairperson of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Oliver beneficially owned 38,637 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Oliver owned approximately $5.4 million worth of eHealth stock.

58.     For the fiscal year ended December 31, 2019, Defendant Oliver received $227,573 in compensation from the Company. This included $72,500 in fees earned in cash and $155,073 in stock awards. For the fiscal year ended December 31, 2018, Defendant Oliver received $217,928 in compensation from the Company. This included $52,500 in fees earned in cash and $165,428 in stock awards.

59.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Oliver made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| August 8, 2018 | 30,750 | $24.84 | $    763,830.00 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

60.     The Company's 2020 Proxy Statement stated the following about Defendant Oliver:

*Jack L. Oliver, III. Director.* Jack Oliver has served as a director since December 2005. Since March 2005, Mr. Oliver has been a senior advisor and practice group leader at the law firm Bryan Cave Leighton Paisner LLP. Mr. Oliver also has served as a managing partner at Dock Square Capital LLC, a merchant banking firm engaged in principal equity investments and other strategic advisory services, since January 2017. From March 2009 to December 2016, Mr. Oliver served as a senior advisor at Barclay's PLC with a focus on Barclay's global client relationship management. Prior to his work at

Bryan Cave, Mr. Oliver served on various political campaigns, including those for the candidacies of Senator Jack Danforth, Senator Kit Bond, Senator John Ashcroft and Congressman Jim Talent. He is also a former deputy chairman of the Republican National Committee and was national finance director for President George Walker Bush's presidential campaign. Mr. Oliver holds a B.A. degree in political science and communications from Vanderbilt University and a J.D. from the University of Missouri School of Law. Mr. Oliver brings to our board of directors his political acumen and experience with government policy-making and expertise in strategy development, acquired through his legal training and his extensive involvement with several successful senatorial, congressional and presidential campaigns, all of which inform his views with respect to the strategic direction of our company.

61.    Upon information and belief, Defendant Oliver is a citizen of the State of Missouri.

**Defendant Wolf**

62.    Defendant Dale B. Wolf ("Wolf") has served as a Company director since August 2019. He also serves as a member of the Company's Nominating and Corporate Governance Committee, and as chairperson of the Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Wolf beneficially owned 3,000 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2020 was $140.82, Defendant Wolf owned approximately $422,460 worth of eHealth stock.

63.    For the fiscal year ended December 31, 2019, Defendant Wolf received $180,247 in compensation from the Company. This included $25,000 in fees earned in cash and $155,247 in stock awards.

64.    The Company's 2020 Proxy Statement stated the following about Defendant Wolf:

*Dale B. Wolf. Director.* Dale Wolf has served as a director since August 2019. Mr. Wolf served as president and chief executive officer of One Call Care Management, a provider of specialized solutions to the workers' compensation industry, from January 2016 to February 2019 and as executive chairman from September 2015 to January 2016. Mr. Wolf also served as the president and chief executive officer of DBW Healthcare, Inc., a health care consulting company, from January 2014 to June 2018. Mr. Wolf served as the executive chairman of Correctional Healthcare Companies, Inc., a national provider of correctional healthcare solutions, from December 2012 to July 2014. From 2005 to 2009, Mr. Wolf served as chief executive officer of Coventry Health Care, Inc., a diversified national health care company, and served as the executive vice president, chief financial officer and treasurer of Coventry Health Care, Inc. from 1996 to 2005. Mr. Wolf holds a B.A. degree in mathematics from Eastern Nazarene College, completed the MIT Sloan School senior executive program and is a Fellow of the Society of Actuaries. Mr. Wolf serves as the chairman of the board of directors of Molina Healthcare, Inc. Mr. Wolf brings to our board of directors extensive knowledge of the managed care and health

insurance industry and expertise in executive management, business and financial strategies.

65.     Upon information and belief, Defendant Wolf is a citizen of the State of Florida.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

66.     By reason of their positions as officers, directors, and/or fiduciaries of eHealth and because of their ability to control the business and corporate affairs of eHealth, the Individual Defendants owed eHealth and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage eHealth in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of eHealth and its shareholders so as to benefit all shareholders equally.

67.     Each director and officer of the Company owes to eHealth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of eHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.     To discharge their duties, the officers and directors of eHealth were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of eHealth, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants

who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised eHealth's Board at all relevant times.

71.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of eHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of eHealth were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to eHealth's own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how eHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of eHealth and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that eHealth's operations would comply with all applicable laws and eHealth's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to eHealth and the shareholders the duty of loyalty requiring that each favor eHealth's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of eHealth and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with eHealth, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by eHealth.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of eHealth, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of eHealth and was at all times acting within the course and scope of such agency.

## EHEALTH'S CODE OF CONDUCT

82.    eHealth's Code of Conduct "sets out basic principles to guide all directors, officers and employees of eHealth, Inc. and its subsidiaries[.]"

83.    The purpose of the Code of Conduct is to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that eHealth files with, or submits to, the Securities and Exchange Commission (the "**SEC**") and in other public communications made by eHealth;

- Compliance with applicable governmental laws, rules and regulations;

- The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- Accountability for adherence to the Code.

84.    In a section titled, "Compliance With Applicable Laws, Rules and Regulations." the Code of Conduct states the following:

Obeying the law is the foundation on which eHealth's ethical standards are built.
You must comply with applicable laws, rules and regulations. Although you are not expected to know the details of all laws, it is important for you to familiarize yourself with the laws applicable to your responsibilities at eHealth and to take advantage of our Legal Department to assist you and answer questions. Any questions as to the applicability of any law, rule or regulation should be directed to eHealth's General Counsel.

85.    In a section titled, "Conflict of Interest," the Code of Conduct states the following in relevant part:

A "conflict of interest" exists when a person's private interests interfere or conflict with the interests of eHealth. You should avoid situations that present potential conflicts of interest, either real or perceived, and should not engage in activities that would make it difficult or appear to make it difficult for you to perform your work objectively and

effectively. In no way should you receive improper personal benefits as a result of your position with eHealth.

86.    In a section titled, "Public Disclosure of Information" the Code of Conduct states the following:

The federal securities laws require eHealth to disclose certain information in various reports that eHealth must file with or submit to the SEC. In addition, from time to time, eHealth makes other public communications, such as issuing press releases. The information in eHealth's public communications, including filings with the SEC, must be full, fair, accurate, timely and understandable. All employees and directors are responsible for acting in furtherance of this policy. In particular, each employee is responsible for complying with eHealth's disclosure controls and procedures and internal controls for financial reporting.

If an employee has a good faith concern regarding questionable accounting, internal accounting controls or auditing matters, or the reporting of fraudulent financial information (collectively, "Accounting Matters"), the employee should report the concern by sending an e-mail or letter (which may be anonymous at the discretion of the employee) to the General Counsel of the Company or his/her designee (the "Legal Department").

Employees who are uncomfortable reporting their concerns about Accounting Matters to the Legal Department may report these concerns to the Audit Committee of the Board of Directors

87.    The Code of Conduct's "Insider Trading" section further states the following:

You are not permitted to use or share confidential information for stock trading purposes or for any other purpose, except the conduct of our business. All non-public information about eHealth should be considered confidential information until it has been adequately disclosed to the public. To use material non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal, and could result in criminal prosecution in addition to the termination of your employment. In order to assist with compliance with laws against insider trading, eHealth has adopted an Insider Trading Policy. A copy of this policy has been distributed to every employee.

You also may not trade in stocks of other companies about which you learn material, non-public information through the course of your employment with or service to eHealth.

88.    In a section titled, "Competition and Fair Dealing," the Code of Conduct states the following:

eHealth seeks to outperform its competition fairly and honestly. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. You should endeavor to respect the rights of and deal fairly with eHealth's customers, suppliers, competitors and employees.

89.     In a section titled, "Record Keeping," the Code of Conduct states the following, in relevant part:

eHealth requires honest and accurate recording and reporting of information in order to make responsible business decisions and to comply with the law.

* * *

All of eHealth's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect eHealth's transactions and must conform both to applicable legal requirements and to eHealth's system of internal controls.

Business records and communications often become public, and you should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood. For more information regarding the use of internet bulletin boards and internet forums, see Section II.B.9 of the Company's Insider Trading Policy and Guidelines with Respect to Certain Transactions in Company Securities.

90.     In a section titled, "Protection and Proper Use of eHealth Assets," the Code of Conduct states the following:

You should endeavor to protect eHealth's assets and ensure their efficient use. Any suspected incident of fraud or theft should immediately be reported for investigation. eHealth equipment should not be used for non-eHealth business, though limited incidental personal use is permitted.

Your obligation to protect eHealth's assets includes protecting its proprietary information, subject to your right to engage in Protected Activity, as defined herein. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of such information would violate eHealth policy and could also be illegal and result in civil or even criminal penalties.

91.     Moreover, the Code of Conduct provides that, "[i]f an employee or director knows of or suspects a violation of the Code, or of applicable laws and regulations, he or she must report it

22

immediately to the Ethics Officer. If the situation warrants or requires it, the reporting person's identity will be kept anonymous to the extent legally permitted."

92.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.     eHealth is a health insurance marketplace whose mission is to "connect every person with the highest quality, most affordable health insurance and Medicare plans for their life circumstance." The Company provides a technology and service platform that offers consumer engagements, education, and health insurance enrollment solutions. eHealth's marketplace sells health insurance products from over 180 health insurance carriers across the United States.

94.     The Company has two business segments: (1) Medicare, and (2) Individual, Family and Small Business, with eHealth's Medicare segment representing the majority of its business.

95.     The foundation of the Individual Defendants' stock promotion scheme was laid in 2014, when the Financial Accounting Standards Board ("FASB") codified ASC 606, also known as "Topic 606." ASC 606 applies to all entities that enter into contracts with customers for the transfer of goods, services, or nonfinancial assets that are not covered under other standards. The underlying principle of ASC 606 is that "an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity *expects to be entitled in exchange for those goods or services*."[3] (Emphasis added).

---

[3]https://www.aicpa.org/InterestAreas/FRC/AccountingFinancialReporting/RevenueRecognition/Downlo

96.     In 2017, the first full year for eHealth's CEO and COO, eHealth saw little to no growth in Company approved Medicare Advantage ("MA") Applications. However, the membership churn rate was also low. The Company utilized these figures when calculating the LTV model for 2018. According to the Muddy Waters Report, 2017 was also the year that eHealth began testing direct response television advertising in-house, resulting in explosive growth the following year. To meet the demand, the Company grew its available call center capacity from 425 agents to 975 agents by the second quarter of 2018, a growth of 129%.

97.     Following its adoption of ASC 606 in January 2018, the Company began preemptively recognizing revenue based on projected estimates attached to enrollees' purported membership lifetimes. To exploit ASC 606, the Individual Defendants began pursuing quantitative growth gleaned through direct response television advertising, at the expense of qualitative growth. The result has been overstatements of the Company's revenue, and other operating measures, including estimates utilized in eHealth's LTV models.

98.     The key driver of eHealth's growth since 2018, direct response advertising, attracts high churn and resultingly unprofitable enrollees. The increasing usage of direct response advertising allowed eHealth's enrollees to soar during the Relevant Period. At the same time, the Company continued to calculate membership life assumptions with results experienced in 2017—before the composition of its membership—and their churn rates—drastically changed. According to the Muddy Waters Report, enrollees with high churn rates include low income enrollees and those below the age of 65. A former executive of eHealth, identified as Executive B in the Muddy Waters Report, maintained that eHealth bought "very cheap inventory on cable TV… that tend to just attract an older demographic and demographic that tends to be watching like 10 hours of TV a day, makes less than $25,000 a year. That's where they get their enormous, [sic] through that channel. That is the most effective scale of channel for all of Medicare."

99.     The composition of eHealth's membership is significant, because the Company utilizes membership profiles and assumptions to formulate LTV models.

---

adableDocuments/FRC_Brief_Revenue_Recognition.pdf. Last visited May 27, 2020.

Verified Shareholder Derivative Complaint

100.    Each enrollee has an estimated worth attached to their predicted membership lifetime based on eHealth's LTV model, which then allows eHealth to book multiple years of revenue at one time.  As outlined in eHealth's annual report filed with the SEC on March 2, 2020 for the fiscal year ended December 31, 2019 (the "2019 10-K"), these estimates include (1) three years for MA plans; (2) five years for Medicare Part D prescription drug plans; and (3) five years for Medicare Supplement plans. According to the Muddy Waters Report, these assumptions are overly optimistic and fail to consider the expected loss of 47% of enrollees within the first year after a sale. They misleadingly remain based (at least in part) on lower churn enrollee cohorts from 2017. Once the initial assumptions are made, the Company proceeds to "constrain" the LTV, which reduces the figures by a certain percent to account for MA approved applications that will not convert into paying customer (7% according to the 2019 10-K). Thereafter, the Company multiplies the constrained LTVs by the approved applications to report revenue. Moreover, the Company also books additional commission revenue for tail customers—thereby overstating expected cash collections from eHealth members significantly. The adjusted calculations made in the Muddy Waters Report that account for the implied churn of 47%, resulted in an implied life of 2.1 years for MA LTV, rather than 3 years. Similar adjustments were made to eHealth's persistence assumptions to reveal the aggressive accounting made in other areas.

101.    MA membership persistence estimates implicate the profitability of enrollees, as the Company breaks even on costs during the first two years of an enrollee's membership. Thus, even slight changes to these assumptions have drastic impacts on the Company's perceived growth and profitability. The net effect of the extra year, according to the Muddy Waters Report, is an overstatement of 28.2%.

102.    In addition to utilizing aggressive assumptions, the Muddy Waters Report pointed out that eHealth's own publications of its churn rates are deliberately obscure and manipulated to minimize or ignore ongoing costs and estimated dropout rates. The result of the report's adjusted calculations was an estimated -$402 loss on every MA customer and a 25% downward adjustment to revenue reported in 2019. The Muddy Waters Report maintained, "[eHealth's] overstatement of future commissions booked as upfront revenue by approximately $128 million . . . means that sales are exaggerated by 33.8%. Meanwhile, after stripping out the inflated commissions and adjusting for ongoing costs of

approximately $135 million, the company's operating profit swings to a deep loss, reflecting a lossmaking underlying business model."

103.    As outlined above, the Individual Defendants were able to maximize off misrepresentations of the Company's success and prospects, netting proceeds of $32.4 million on insider sales during the Relevant Period. Defendant Flanders, in particular, sold 15% of his stake in the Company in January 2020 alone.

**False and Misleading Statements**

***March 19, 2018 Form 10-K***

104.    On March 19, 2018, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Flanders, Francis, Goldberg, Livingston, Oliver, and non-parties Jay W. Jennings, and Ellen O. Tauscher ("Tauscher").  The 2017 10-K described its upcoming adoption to ASC 606, marketing and advertising expenses, and eHealth's expanding call centers as follows:

> The seasonality of our commission revenue will materially change in the first quarter of 2018 as a result of our adoption of Accounting Standards Update 2014-09, *Revenue from Contracts with Customers (Topic 606)*, as discussed in *Note 1-Summary of Business and Significant Accounting Policies* in the *Notes to Consolidated Financial Statements* of this Annual Report on Form 10-K.

> Since a significant portion of our marketing and advertising expenses consists of expenses incurred as a result of payments owed to our marketing partners in connection with health insurance applications submitted on our ecommerce platforms and Medicare-related leads referred to us by our marketing partners and other forms of marketing, our marketing expenses are influenced by seasonal submitted application patterns. For example, due to CMS changing the annual open enrollment period for individual and family health insurance to run from November 1, 2017 through December 15, 2017 for coverage effective in 2018, marketing and advertising expenses were highest during the fourth quarter of 2017. During the first through third quarters of 2017, marketing and advertising expenses were lower, consistent with the lower submitted applications compared to the fourth quarter of 2017. We expect these seasonal trends in marketing and advertising expenses to continue in 2018.

> In preparation for the Medicare annual enrollment period during 2015, 2016 and 2017, and to a lesser extent the open enrollment period for individual and family health insurance plans during the same periods, we began ramping up our customer care center staff during our second and third quarters to handle the anticipated increased volume of health insurance transactions. In the first quarters of 2016 and 2017, we retained

1   substantially all of our Medicare sales and enrollment personnel to handle the anticipated
2   increased volume of Medicare-related applications outside of the open enrollment period.
    We expect these seasonal trends to continue in 2018.

3   105.   Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a)
4   under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Flanders
5   and Francis, attesting to the accuracy of the 2017 10-K.

6   ***April 30, 2018 Proxy Statement***

7   106.   On April 30, 2018, the Company filed its Schedule 14A with the SEC (the "2018 Proxy
8   Statement"). Defendants Flanders, Goldberg, Livingston, and Oliver solicited the 2018 Proxy Statement
9   filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and
10  omissions.[4]

11  107.   With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[o]ur
12  board of directors has adopted a Code of Business Conduct, which is applicable to our directors, officers
13  and employees, including our principal executive officer, principal financial officer, principal
14  accounting officer and persons performing similar functions."

15  108.   The 2018 Proxy Statement was false and misleading because, despite assertions to the
16  contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading
17  statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the
18  Individual Defendants' failures to report violations of the Code of Conduct.

19  109.   The Individual Defendants also caused the 2018 Proxy Statement to be false and
20  misleading with regard to executive compensation in that they purported to employ "pay-for-
21  performance" elements, including equity awards designed to "tie the pay of our Named Executive
22  Officers to their performance and the company's performance[]" and reward executive offers if they
23  "deliver long-term value for our stockholders[,]'"  while failing to disclose that the Company's share
24  price was artificially inflated as a result of false and misleading statements alleged herein.

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based
solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on
behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff
specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation
of fraud, scienter, or recklessness with regard to these allegations and related claims.

110.   The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (i) eHealth utilized accounting techniques that were highly aggressive and overstated membership lifetime modeling assumptions; (ii) the Company depended on direct response television advertising as its primary marketing tool, which attracts droves of high churn enrollees who are unprofitable; (iii) because the Company began pursuing growth that was low quality and uneconomic, the rate of eHealth membership churns sharply climbed from 2017; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**May 9, 2018 Form 10-Q**

111.   On May 3, 2018, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2018 on a Form 10-Q (the "1Q18 10-Q"), which was signed by Defendants Flanders and Francis. The 1Q18 10-Q contained substantively similar statements to the 2017 10-K and stated the following in relevant part about ASC 606 and the Company's revenue recognition practices:

> ***Revenue Recognition (Topic 606)*** **—** In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers (Topic 606)*, requiring an entity to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. In April 2016, the FASB issued ASU No. 2016-10, *Identifying Performance Obligations and Licensing*. ASU 2016-10 provides guidance in identifying performance obligations and determining the appropriate accounting for licensing arrangements.
>
> The effective date and transition requirements for ASU 2016-10 are the same as the effective date and transition requirements in Topic 606 (and any other Topic amended by ASU 2014-09). ASU 2014-09 may be adopted retrospectively to each prior reporting period presented (full retrospective method), or retrospectively with the cumulative effect of initially applying the guidance recognized at the date of initial application (modified retrospective method). We adopted ASC 2014-09 effective January 1, 2018, using the full retrospective method to restate each prior reporting period presented. The adoption of this standard had a material impact on our condensed consolidated balance sheets and condensed consolidated statements of comprehensive income (loss), but had no impact on total net cash provided by (used in) operating, investing, or financing activities within the condensed consolidated statements of cash flows.

* * *

We are compensated by the receipt of commission payments from health insurance carriers whose health insurance policies are purchased through our ecommerce platforms or our customer care centers. We may also receive commission bonuses based on our attaining predetermined target sales levels for Medicare, individual and family, small business and ancillary health insurance products, or other objectives, as determined by the health insurance carrier, which we recognize as commission revenue when we achieve the predetermined target sales levels or other objectives. In addition, we also generate revenue from non-commission revenue sources, which include online sponsorship and advertising, technology licensing and lead referrals.

The core principle of Topic 606 is to recognize revenue upon the transfer of promised goods or services to customers in an amount that reflects the consideration the entity expects to be entitled to in exchange for those goods or services.

112.    Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Flanders and Francis attesting to the accuracy of the 1Q18 10-Q.

**August 7, 2018 Form 10-Q**

113.    On August 7, 2018, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2018 on a Form 10-Q (the "2Q18 10-Q"), which was signed by Defendants Flanders and Yung. The 2Q18 10-Q contained the same statements referenced above in the 1Q18 10-Q and made substantively similar statements to the 2017 10-K.

114.    Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Flanders and Yung attesting to the accuracy of the 2Q18 10-Q.

**November 6, 2018 Form 10-Q**

115.    On November 6, 2018, the Company filed its quarterly report with the SEC for the third quarterly period ended September 30, 2018 on a Form 10-Q (the "3Q18 10-Q"), which was signed by Defendants Flanders and Yung. The 3Q18 10-Q contained the same statements referenced above in the 1Q18 and 2Q18 10-Qs and made substantively similar statements to the 2017 10-K.

116.    Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Flanders and Yung attesting to the accuracy of the 3Q18 10-Q.

**January 22, 2019 Form 8-K and Press Release**

117.    On January 22, 2019, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release announced eHealth's preliminary results for the fourth quarter and fiscal year ended December 31, 2018

and provided guidance for the full year ending December 31, 2019. The press release touted eHealth's "operational achievements and financial results for the fourth quarter and the full year 2018," with Defendant Flanders commenting that the Company's "strong execution during the critical Medicare Annual Enrollment Period validated eHealth's value proposition for this important market and has allowed us to exceed our revenue and EBITDA expectations for 2018. We expect to maintain this momentum as reflected in our 2019 annual guidance."

118.   As to the 2019 annual guidance, the press release stated in relevant part:

**2019 Guidance**

The company is providing the following guidance for the full year ending December 31, 2019 based on information available as of January 22, 2019. These expectations are forward-looking statements, and eHealth assumes no obligation to update these statements. Actual results may be materially different and are affected by the risk factors and uncertainties identified in this release and in eHealth's annual and quarterly filings with the Securities and Exchange Commission:

- Total revenue is expected to be in the range of $290 million to $310 million. Revenue from the Medicare segment is expected to be in the range of $256 million to $272 million.

- GAAP net income is expected to be in the range of $16.3 million to $21.3 million.

  Adjusted EBITDA [] is expected to be in the range of $45 million to $50 million.

***February 21, 2019 Form 8-K and Press Release***

119.   On February 21, 2019, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release announced eHealth's financial results for the fourth quarter and fiscal year ended December 31, 2018 and confirmed the prior guidance for the full year ending December 31, 2019. The press release further quoted Defendant Flanders, who stated in relevant part:

2018 was a defining year for eHealth in validating our vision and growth strategy for the Medicare market. We delivered the strongest Medicare Annual Enrollment Period in the company's history, achieved a number of important executional milestones and reported financial results which significantly exceeded our expectations. I am proud of these accomplishments.

1

*March 14, 2019 Form 10-K*

2      120.    On March 14, 2019, the Company filed its annual report with the SEC for the fiscal year

3   ended December 31, 2018 on a Form 10-K (the "2018 10-K"), which was signed by Defendants

4   Flanders, Yung, Goldberg, Livingston, Oliver, and non-party Tauscher. The 2018 10-K stated the

5   following about the Company's business strategy and growth:

6      On January 22, 2018, we completed our acquisition of Wealth, Health and Life Advisors,
       LLC, more commonly known as GoMedigap, a technology-enabled provider of Medicare
7      Supplement enrollment services. GoMedigap has built a leading consumer acquisition
       and engagement platform focused on meeting the Medicare Supplement insurance needs
8      of its individual customers with a technology-enabled, consumer-centric approach that
       aligns with our mission and operations. This strategic acquisition significantly enhanced
9      our growing presence in the Medicare Supplement market, put us in a stronger position
       with carriers and strategic partners and has helped us to us to accelerate our projected
10     Medicare plan enrollment growth.

11
                                          *  *  *
12     *Increase Online Enrollment to Improve Margins and Enhance Operating Leverage*

13
       We view our consumer engagement platform as unique in the Medicare market and as
14     attractive to the growing number of Medicare beneficiaries who prefer to research,
       compare and purchase health insurance online. The percentage of members who submit
15     applications for Medicare Advantage and Medicare Supplement products online through
       our platform has substantially increased from 10% in 2017 to 16% in 2018. Applications
16     submitted online include applications submitted with no assistance or some assistance
       from call center agents prior to the final application submission. We are able to scale
17     growth more rapidly and at an incrementally lower cost basis though our online platform,
       which significantly reduces our reliance on and financial and managerial resources
18     associated with our contact center operations. We have successfully reduced our variable
       marketing cost per approved Medicare member year-over-year by 12% and 9% for the
19     years ended December 31, 2018 and 2017, respectively.
20

21     *Expand Our Strategic Relationships*

22     The value of our consumer engagement and enrollment solution platform allows us to
       work closely with strategic partners in the health care market to leverage their
23     relationships with consumers. In 2018, we had strategic relationships with major retail
       pharmacies in the United States, with leading hospital systems in the United States and
24     with select financial and affinity marketing organizations to expand the availability of our
       platform to more consumers. Through greater data integration, co-branding and further
25     investments to improve the customer experience with our platform, we believe that we
       can create significant value for each of our partners and further expand each of our
26     partner relationships.

27
       *Selectively Grow our Consumer Engagement Platform Outside of the Medicare Market*
28

Our current focus is to operate our individual and family plan business profitably and grow the small business portion of our business. We believe that our engagement, education and enrollment platform provides high-value solutions for consumers in these markets. To capitalize on our small business opportunity, we established a dedicated small business unit in 2016.

121.    The 2018 10-K further stated the following in relevant part about the Company's commission revenue recognition, and marketing and advertising expenses:

**Seasonality**

The majority of our commissions revenue is recognized in the fourth quarter of each calendar year as a result of our adoption of Accounting Standards Update 2014-09, *Revenue from Contracts with Customers (ASC 606)*, which we adopted using the full retrospective transition method on January 1, 2018 and which is further discussed in *Note 1-Summary of Business and Significant Accounting Policies* in the *Notes to Consolidated Financial Statements* of this Annual Report on Form 10-K. We have historically sold a significant portion of the Medicare plans we sell during the year in the fourth quarter during the Medicare annual enrollment period, when Medicare-eligible individuals are permitted to change their Medicare Advantage and Medicare Part D prescription drug coverage for the following year. During 2018, 2017 and 2016, 61%, 52% and 49%, respectively, of our Medicare plan-related applications were submitted during the fourth quarter. As a result, we generate a significant portion of our commission revenues related to new Medicare plan-related enrollments in the fourth quarter.

The annual open enrollment period for individual and family health insurance also takes place in the fourth quarter of the calendar year, resulting in seasonality of individual and family plan submitted applications volume. During 2018, 2017 and 2016, 64%, 52% and 33%, respectively, of our individual and family plan-related applications were submitted during the fourth quarter. As a result, we generate a significant portion of our commission revenues related to individual and family plan-related enrollments in the fourth quarter.

Our marketing and advertising expenses are typically lower in each of our first through third quarters compared to the fourth quarter. We incur a significant portion of our marketing and advertising expenses in the fourth quarter as a result of the Medicare annual enrollment period and the open enrollment period under the Affordable Care Act. Our marketing and advertising increases in the fourth quarter as a result of increased amounts owed to our marketing partners in connection with lead referral arrangements as well as an increase in the number of health insurance applications submitted on our ecommerce platforms referred to us by our marketing partners. We also typically incur an increase in other marketing and advertising related expenses in the fourth quarter. We expect this seasonal trend in marketing and advertising expenses to continue in 2019.

In preparation for the Medicare annual enrollment period during 2018, 2017 and 2016, and to a lesser extent the open enrollment period for individual and family health insurance plans during the same periods, we began ramping up our customer care center

staff during the third and fourth quarters to handle the anticipated increased volume of health insurance transactions, which resulted in higher customer care and enrollment expenses in the third and fourth quarters. We expect this seasonal trend in customer care and enrollment expenses to continue in 2019.

* * *

We utilize a practical expedient to estimate commission revenue for each insurance product by applying the use of a portfolio approach to group approved members by the effective month of the relevant policy (referred to as a "cohort"). This allows us to estimate the commissions we expect to collect for each approved member cohort by evaluating various factors, including but not limited to, contracted commission rates, carrier mix and expected member churn.

122.    Attached to the 2018 10-K were SOX certifications signed by Defendants Flanders and Yung, attesting to the accuracy of the 2018 10-K.

### *April 25, 2019 Form 8-K and Press Release*

123.    On April 25, 2019, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release announced eHealth's financial results for the first quarter of the fiscal year ended December 31, 2019. The press release quoted Defendant Flanders, who stated in relevant part:

We entered 2019 with great momentum, setting the stage for another year of strong execution and growth. Our first quarter financial results were driven by strong performance of our Medicare business which exceeded our expectations, demonstrating both our unique value proposition for health care consumers and our ability to drive those consumers to our market-leading engagement and enrollment platform at scale. We continue to see significant potential to scale customer acquisition in the Medicare market while maintaining attractive costs and achieving operating leverage with our fixed costs. Based on our first quarter outperformance and our current investment plans for the year, we are increasing our 2019 annual revenue and adjusted EBITDA guidance. At the mid-point of our revised annual guidance we now expect to generate revenue growth of approximately 29% and adjusted EBITDA growth of over 70%.

124.    The press release also revised the 2019 guidance upward by $25 million, stating that:

Total revenue is expected to be in the range of $315 million to $335 million, compared to previous guidance of $290 million to $310 million. Revenue from the Medicare segment is expected to be in the range of $281 million to $297 million, compared to previous guidance of $256 million to $272 million. Revenue from the Individual, Family and Small Business segment is expected to be in the range of $34 million to $38 million, consistent with previous guidance.

*April 29, 2019 Proxy Statement*

125.    On April 29, 2019, the Company filed its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Flanders, Brimmer, Goldberg, Livingston, and Oliver solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

126.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[o]ur board of directors has adopted a code of business conduct, which is applicable to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions."

127.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

128.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "tie the pay of our Named Executive Officers to their performance and that of the company []" and reward executive offers if they "deliver long-term value for our stockholders[,]'" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

129.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (i) eHealth utilized accounting techniques that were highly aggressive and overstated membership lifetime modeling assumptions; (ii) the Company depended on direct response television advertising as its primary marketing tool, which attracts droves of high churn enrollees who are unprofitable; (iii) because the Company began pursuing growth that was low quality and uneconomic, the rate of eHealth membership

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

churns sharply climbed from 2017; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*May 7, 2019 Form 10-Q*

130.    On May 7, 2019, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2019 on a Form 10-Q (the "1Q19 10-Q"), which was signed by Defendants Flanders and Yung. The 1Q19 10-Q stated the following, in relevant part, about eHealth's use of estimates and the Company's constrained LTV:

> ***Use of Estimates***—The preparation of condensed consolidated financial statements and related disclosures in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported and disclosed in the condensed consolidated financial statements and accompanying notes. On an ongoing basis, we evaluate our estimates, including those related to, but not limited to, the useful lives of intangible assets, fair value of investments, recoverability of intangible assets, the commissions we expect to collect for each approved member cohort, valuation allowance for deferred income taxes, provision for income taxes and the assumptions used in determining stock-based compensation. We base our estimates of the carrying value of certain assets and liabilities on historical experience and on various other assumptions that we believe to be reasonable. Actual results may differ from these estimates.

> \* \* \*

> We utilize a practical expedient to estimate commission revenue for each insurance product by applying the use of a portfolio approach to group approved members by the effective month of the relevant policy (referred to as a "cohort"). This allows us to estimate the commissions we expect to collect for each approved member cohort by evaluating various factors, including but not limited to, contracted commission rates, carrier mix and expected member churn.

> \* \* \*

> The constrained LTV of commissions per approved member for Medicare Advantage increased 8% in the three months ended March 31, 2019 compared to the three months ended March 31, 2018 primarily due to improved member retention and commission rate increases. The constrained LTV of commissions per Medicare Supplement approved member and constrained LTV of commissions per Medicare Part D approved member decreased 3% and 4%, respectively, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018 primarily as a result of an increase in member churn. The constrained LTV of commissions per short-term approved member increased 9% in the three months ended March 31, 2019 compared to the three months ended

March 31, 2018 primarily as a result of selling higher priced plans and an increase in average duration.

131.     Attached to the 1Q19 10-Q were SOX certifications signed by Defendants Flanders and Yung attesting to the accuracy of the 1Q19 10-Q.

### July 25, 2019 Form 8-K and Press Release

132.     On July 25, 2019, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release announced eHealth's financial results for the second quarter of the fiscal year ended December 31, 2019. The press release touted eHealth's growing membership and purported revenue. The press release quoted Defendant Flanders, who stated in relevant part:

> We delivered another strong quarter once again exceeding our expectations and building momentum in our Medicare business that has continued to scale rapidly accompanied by EBITDA margin expansion. Approved Medicare members grew 78% year-over-year, driving a 105% increase in Medicare revenue year-over-year and a significant increase in Medicare segment profit. Based on our performance to-date, access to expanded telesales capacity and continued progress in gaining greater effectiveness across our operations, we are increasing our 2019 revenue and Adjusted EBITDA guidance for the second time this year.

### August 8, 2019 Form 10-Q

133.     On August 8, 2019, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2019 on a Form 10-Q (the "2Q19 10-Q"), which was signed by Defendants Flanders and Yung. The 2Q19 10-Q contained statements that were substantively similar to those in the 1Q19 10-Q and outlined eHealth's constrained LTV model as follows:

> The constrained LTV per approved member represents commissions estimated to be collected over the estimated life of an approved member's policy after applying constraints in accordance with our revenue recognition policy. The estimate is driven by multiple factors, including but not limited to, contracted commission rates, carrier mix, expected policy churn and applied constraints. These factors may result in varying values from period to period. We evaluate constrained LTVs on a quarterly basis, and as part of that process, we apply an estimated future churn factor that is based on observed historical results for that relevant product. For additional information on constraints, see *Note 1—Summary of Business and Significant Accounting Policies in the Notes to Condensed Consolidated Financial Statements* of this Quarterly Report on Form 10-Q.

> For small business, the constrained LTV represents the estimated commissions we expect to collect on each member covered by the policy over the following twelve months. The

estimate is driven by multiple factors, including but not limited to, contracted commission rates, carrier mix, expected policy churn and applied constraints. These factors may result in varying values from period to period.

134.    The 2Q19 10-Q further noted the following, in relevant part, about eHealth's commissions, membership churn, and retention rates:

The constrained LTV of commissions per approved member for Medicare Advantage plans increased 15% in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 primarily due to improved member retention on some of our member cohorts, favorable product mix and commission rate increases. When comparing the three months ended June 30, 2019 to the three months ended June 30, 2018, the constrained LTV of commissions per Medicare Supplement approved member decreased 6% primarily as a result of an increase in member churn, and the constrained LTV of commissions per Medicare Part D approved member decreased 12% primarily due to carrier mix. We experienced a decreased member retention rate in the Medicare Advantage members that we enrolled during the Medicare annual enrollment period in the fourth quarter of 2018. We believe the reintroduction of the Medicare open enrollment period during the first quarter of 2019 contributed to the decreased retention rate since Medicare Advantage members that we enrolled during the annual enrollment period in the fourth quarter of 2018 were able to enroll in another Medicare Advantage plan or disenroll from their Medicare Advantage plan and return to original Medicare during the Medicare open enrollment period. While the net impact of the Medicare open enrollment period was positive to our Medicare business, we expect the constrained LTVs for Medicare Advantage plans to decrease in the fourth quarter of 2019 compared to the fourth quarter of 2018, as we expect lower retention rates for Medicare Advantage members that we enroll during the fourth quarter going forward.

The constrained LTV of commissions per qualified health plans and non-qualified health plans increased 60% and 34%, in the three months ended June 30, 2019 compared with the three months ended June 30, 2018 mostly due to improved member churn.

The constrained LTV of commissions per short-term approved member increased 67% in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 primarily as a result of selling higher priced plans and an increase in average duration.

135.    Attached to the 2Q19 10-Q were SOX certifications signed by Defendants Flanders and Yung attesting to the accuracy of the 2Q19 10-Q.

**October 24, 2019 Form 8-K and Press Release**

136.    On October 24, 2019, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release

announced eHealth's financial results for the third quarter of the fiscal year ended December 31, 2019 and confirmed the 2019 guidance. The press release quoted Defendant Flanders, who highlighted eHealth's surpassing expectations and strong consumer demand, stating in relevant part:

> Strong momentum in our business continued with another quarter of meaningful outperformance against our expectations. Our third quarter results reflect strong revenue and enrollment growth in our Medicare and Individual & Family Plan businesses and a significant investment in our telesales capacity ahead of the Medicare Annual Enrollment Period (AEP). We have entered this AEP from a position of strength, allowing us to recently guide up to the high end of our 2019 revenue and adjusted EBITDA forecast based on the quality and scale of call center resources in place, the acceleration of our online enrollments and strength of consumer demand

***November 8, 2019 Form 10-Q***

137.    On November 8, 2019, the Company filed its quarterly report with the SEC for the third quarterly period ended September 30, 2019 on a Form 10-Q (the "3Q19 10-Q"), which was signed by Defendants Flanders and Yung. The 3Q19 10-Q contained statements that were substantively similar to those in the 1Q19 and 2Q19 10-Qs.

138.    Attached to the 3Q19 10-Q were SOX certifications signed by Defendants Flanders and Yung attesting to the accuracy of the 3Q19 10-Q.

***January 23, 2020 Form 8-K and Press Release***

139.    On January 23, 2020, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release announced eHealth's preliminary results for the fourth quarter and fiscal year ended December 31, 2019. The press release quoted Defendant Flanders, who lauded eHealth's impressive achievements and exploding consumer demand, stating in relevant part:

> I am proud of our achievements in 2019. After raising our guidance twice in the past year, we significantly exceeded our financial and operating targets driven by consistently strong execution throughout the year. 2019 culminated with an exceptional performance by our team during the fourth quarter Medicare annual enrollment period. Our marketing and business development organizations drove record consumer demand to the eHealth platform allowing us to grow fourth quarter approved Medicare members in excess of 85%," commented Scott Flanders, chief executive officer of eHealth. "We remain excited about the Medicare market opportunity and significant growth potential ahead of us and are looking forward to sharing our outlook for 2020 as part of our fourth quarter earnings release next month.

140.    The press release further summarized eHealth's preliminary results and membership growth as follows:

**Fourth Quarter and Fiscal Year 2019 Preliminary Results**

Excluding any positive impact from the changes in estimates to residual revenue for Medicare Advantage members approved since our adoption of ASC 606 through the third quarter of 2019, we expect the following fourth quarter and fiscal year 2019 results:

- Revenue for the fourth quarter of 2019 is expected to be in the range of $257.5 to $259.5 million with expected fourth quarter revenue from the Medicare segment in the range of $239.0 to $240.5 million.

- GAAP net income for the fourth quarter of 2019 is expected to be in the range of $53.0 to $55.0 million. Adjusted EBITDA(a) for the fourth quarter of 2019 is expected to be in the range of $98.5 to $100.5 million.

- Revenue for the year ended December 31, 2019 is expected to be in the range of $462.0 to $464.0 million as compared to the company's guidance of $365.0 to $385.0 million. Revenue from the Medicare segment for the full year 2019 is expected to be in the range of $403.5 to $405.0 million as compared to the company's guidance of $318.0 to $333.0 million.

- GAAP net income for the year ended December 31, 2019 is expected to be in the range of $31.0 to $33.0 million as compared to the company's guidance of $20.9 to $25.9 million.

- Adjusted EBITDA[] for the year ended December 31, 2019 is expected to be in the range of $89.0 to $91.0 million as compared to the company's guidance of $65.0 to $70.0 million.

**Approved Members**

The number of approved members for all Medicare products, which includes Medicare Advantage, Medicare Supplement and Medicare Part D Prescription Drug Plans, grew 88% during the fourth quarter of 2019 compared to the fourth quarter of 2018. The number of approved members for Medicare Advantage products grew 100% over the same time period. For the full year 2019, the number of approved members for all Medicare products grew 81% compared to the full year 2018 with approved members for Medicare Advantage products growing 88% over the same time period.

The number of approved members for major medical individual and family plan (IFP) products grew 1% during the fourth quarter of 2019 compared to the fourth quarter a year ago. For the full year 2019, the number of approved members for IFP products declined 25% compared to 2018. The decline in approved IFP members reflects weaker than

expected enrollment activity in the overall individual and family health insurance market as well as our continuing emphasis on the Medicare business in allocating our marketing resources.

***February 20, 2020 Form 8-K and Press Release***

141.    On February 20, 2020, eHealth issued a press release which was also attached to a current report filed with the SEC the same day on a Form 8-K signed by Defendant Yung. The press release announced eHealth's financial results for the fourth quarter and fiscal year ended December 31, 2019. The press release outlined eHealth's financial results as follows:

**Fourth Quarter 2019 Overview**

- Revenue for the fourth quarter of 2019 was $301.7 million, a 124% increase compared to $134.9 million for the fourth quarter of 2018.

- GAAP net income for the fourth quarter of 2019 was $88.8 million compared to net income of $26.1 million for the fourth quarter of 2018.

- Adjusted EBITDA was $142.6 million for the fourth quarter of 2019 compared to $51.9 million for the fourth quarter of 2018.

- Fourth quarter 2019 revenue and adjusted EBITDA include the positive impact of $42.3 million in revenue resulting from a change in estimate for expected cash commission collections relating to existing Medicare Advantage plans enrolled in prior to the fourth quarter.

- Fourth quarter 2019 approved members for all Medicare products grew 88% compared to the fourth quarter of 2018.

142.    The press release included Defendant Flanders' commentary, and provided in relevant part:

Scott Flanders, chief executive officer of eHealth stated, "We ended the year on a strong note, delivering the best annual enrollment period in the company's history and generating financial results that significantly exceeded our 2019 annual guidance across multiple metrics, including revenue, GAAP net income and adjusted EBITDA. We also significantly increased our Medicare enrollment volumes and the number of major medical Medicare applications submitted online through our platform compared to a year ago – a critical element of our Medicare growth strategy. I would like to emphasize that the high level of enrollment and revenue growth that we achieved in 2019 were accompanied by meaningful adjusted EBITDA and GAAP net income margin expansion compared to 2018. Looking ahead, we anticipate the momentum we have built over the past two years to continue into 2020, and we believe we are well-positioned to continue outpacing the overall Medicare market growth as a result of our strong consumer value

proposition, the depth of our technology platform and our demand generation expertise." During the fourth quarter of 2019, eHealth worked with an external corporate valuation consultant to enhance its approach to estimating the lifetime values of plans it sold and to incorporate statistical tools to increase the accuracy of these estimates with an emphasis on improving member retention forecasting. Fourth quarter and full year 2019 financial results reflect the impact of the changes made to enhance eHealth's Medicare Advantage plan lifetime value forecasting model resulting from this project. Specifically, our fourth quarter and full year 2019 revenue each included a positive impact of $50.8 million from the change in estimate for expected cash commission collections relating to outstanding Medicare Advantage plans. Of this amount, $42.3 million is a change in estimate in expected cash commission collections for Medicare Advantage plans since we began selling such products through the third quarter of 2019.

### *March 2, 2020 Form 10-K*

143.   On March 2, 2020, the Company filed the 2019 10-K, which was signed by Defendants Flanders, Yung, Brimmer, Brooke, Goldberg, Livingston, Oliver, and Wolf.  The 2019 10-K provided confirmed the financial results announced in the prior press release and stated the following, in relevant part, about eHealth's application of ASC 606, its revenue recognition practices, its LTV model and related estimations and associated risks:

Our operating results will be impacted by factors that impact our estimate of the constrained lifetime value (LTV) of commissions per approved member. Effective January 1, 2018, we adopted Accounting Standards Update 2014-09, *Revenue from Contracts with Customers (ASC 606)* using the full retrospective method, which required us to revise our historical financial information by applying the new standard. The adoption had a material impact on our consolidated financial statements. The most significant impact of the standard was on our commission revenue. Since the adoption of ASC 606, we recognize revenue at the time of plan approval by applying the latest estimated constrained LTV for that product. We estimate commission revenue for each product by using a portfolio approach to a group of approved members by plan type and the effective month of the relevant plan, which we refer to as "cohorts". We estimate the cash commissions we expect to collect for each approved member cohort by evaluating various factors, including but not limited to, commission rates, carrier mix, estimated average plan duration, the regulatory environment, and cancellations of insurance plans offered by health insurance carriers with which we have a relationship. On a quarterly basis, we recompute LTV at a cohort level for all outstanding cohorts, review and monitor changes in the data used to estimate LTV as well as the cash received for each cohort as compared to our original estimates. The fluctuations of cash received for each cohort and LTV can be significant and may or may not be indicative of the need to adjust LTVs for prior period cohorts. Management analyzes these fluctuations and, to the extent we see changes in our estimates of the cash commission collections that we believe are indicative of an increase or decrease to prior period LTVs, we will adjust LTV for the affected cohorts at the time such determination is made. Changes in LTV may result in an increase or a decrease to revenue and a corresponding increase or decrease to

commissions receivable, accordingly. We refer the net commission revenue from members approved in prior periods as "adjustment revenue" and our revenue can fluctuate significantly from period to period as a result of adjustment revenue.

Adjustment revenue can have a significant favorable or unfavorable impact on our revenue. During the fourth quarter of 2019, we incorporated statistical tools to increase the accuracy of LTV estimates with an emphasis on improving member retention forecasting. As a result, we recognized adjustment revenue of $50.8 million for Medicare Advantage plans during the fourth quarter of 2019, which increased our adjustment revenue for all Medicare products to $55.3 million for the year ended December 31, 2019.

As we continue to evaluate our LTV estimation models, we may in the future make further changes based on a number of factors and such changes could result in significant increases or decreases in our revenue. Constrained LTVs are estimates and are based on a number of assumptions, which include, but are not limited to, estimates of the conversion rates of approved members into paying members, forecasted average plan duration and forecasted commission rates we expect to receive per approved member's plan. These assumptions are based on historical trends and require significant judgment by our management in interpreting those trends and in applying the constraints. Changes in our historical trends will result in changes to our constrained LTV estimates in future periods and therefore could adversely affect our revenue and financial results in those future periods. As a result, negative changes in the factors upon which we estimate constrained LTVs, such as reduced conversion of approved members to paying members, increased health insurance plan termination or a reduction in the lifetime commission amounts we expect to receive for selling the plan to a member or other changes could harm our business, operating results and financial condition. In addition, if we ultimately receive commission payments that are less than the amount we estimated when we recognized commission revenue, we would need to write off the remaining commission receivable balance, which would adversely impact our business, operating results, and financial condition.

The rate at which approved members become paying members is a significant factor in our estimation of constrained LTVs. For example, during the first open enrollment period under the Affordable Care Act, we experienced a decline in the rate at which members approved for individual and family health insurance turned into paying members, which harmed our operating results. To the extent we experience a similar decline in the rate at which approved members turn into our paying members, our business, operating results, and financial condition would be harmed. The forecasted average plan duration is another important factor in our estimation of constrained LTV. We receive commissions from health insurance carriers for health insurance plans sold through us. When one of these plans is canceled, or if we otherwise do not remain the agent on the policy, we no longer receive the related commission payment. Our forecasted average plan duration and health insurance plan termination rate are calculated based on our historical data by plan type. As a result, our inability to produce accurate forecasted average plan duration may adversely impact our business, operating results and financial condition.

Verified Shareholder Derivative Complaint

Commission rates are also part of the significant factors in our estimation of constrained LTVs. The commission rates we receive are impacted by a variety of factors, including the particular health insurance plans chosen by our members, the carriers offering those plans, our members' states of residence, the laws and regulations in those jurisdictions, the average premiums of plans purchased through us and health care reform. Our commission revenue per member has in the past decreased, and could in the future decrease, as a result of reductions in contractual commission rates, a change in the mix of carriers whose products we sell during a given period, and increased health insurance plan termination rates, all of which are beyond our control and may occur on short notice. To the extent these and other factors cause our commission revenue per member to decline, our revenue may decline and our business, operating results and financial condition would be harmed. Given that Medicare-related and individual and family health insurance purchasing is concentrated during enrollment periods, we may experience a shift in the mix of Medicare related and individual and family health insurance products selected by our members over a short period of time. Any reduction in our average commission revenue per member during the enrollment periods caused by such a shift or otherwise would harm our business, operating results and financial condition.

144.    Attached to the 2019 10-K were SOX certifications signed by Defendants Flanders and Yung, attesting to the accuracy of the 2019 10-K.

145.    The statements in ¶¶104-05, 111-24, and 130-44 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (i) eHealth utilized accounting techniques that were highly aggressive and overstated membership lifetime modeling assumptions; (ii) the Company depended on direct response television advertising as its primary marketing tool, which attracts droves of high churn enrollees who are unprofitable; (iii) because the Company began pursuing growth that was low quality and uneconomic, the rate of eHealth membership churns sharply climbed from 2017; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge**

146.    Before the market opened on April 8, 2020, Muddy Waters published the Muddy Waters Report, contending that eHealth's aggressive accounting "masks what we believe is a significantly unprofitable business." The Muddy Waters Report specifically pointed out that membership churn "immediately skyrocketed" after eHealth adopted ASC 606 and maintained that the Company was

"pursuing low quality, lossmaking growth while its LTVs are based on lower churn, pre-growth cohorts."
The report further determined that:

> the key driver of [eHealth's] growth since 2018 has been EHTH's reliance on Direct Response television advertising, which attracts an unprofitable, high churn enrollee. To generate this unprofitable growth, EHTH has been incinerating cash, which we expect it to continue to do until this value destruction slows down or stops.  EHTH management is, in out view, running a massive stock promotion.

147.    The Muddy Waters Report revealed eHealth's improper application of ASC 606, noting in relevant part:

> The crux of EHTH's application of ASC 606 is that EHTH books multiple years of commission revenue by claiming that no further performance on its part is necessary in order to collect these commissions. This ignores the reality that EHTH needs to provide ongoing service to members and conduct outreach to them in order to retain them. We therefore wholly disagree with EHTH's recognizing more than one year of commissions in each period.

148.    The Muddy Waters Report analyzed the Company's purported LTV formula and membership lifetime assumptions and reevaluated these metrics to account for eHealth's higher churn rates and changed enrollee profile. Based on Muddy Waters' assessment, the Muddy Waters Report concluded, *inter alia*, that the Company's current estimates were highly aggressive and that eHealth's "practice of estimating lifetimes means that EHTH books three years of future sales for an MA application even though it should expect to lose 47% of its members over the first year postsale[]" and that "[w]e believe the company has used its small group of longer-lived customers to justify a three-year life to begin with, as first-year retention at the company is so poor." The report's revised calculations indicated that the Company would lose 1$402 on every MA customer and the Company's 2019 revenue was overstated by at least 25%. The Muddy Waters Report further concluded that, "EHTH's overstatement of future commissions booked as upfront revenue by approximately $128 million, detailed above, means that sales are exaggerated by 33.8%. Meanwhile, after stripping out the inflated commissions and adjusting for ongoing costs of approximately $135 million, the company's operating profit swings to a deep loss, reflecting a lossmaking underlying business model."

149.    On this news, the Company's stock price fell over 12%, from closing at $116.90 per share on April 7, 2020, to close at $103.20 per share on April 8, 2020.

## Repurchases During the Relevant Period

150.    Upon information and belief, during the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

151.    According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 filed with the SEC on May 11, 2020 (the "1Q20 10-Q"), the Company repurchased 4,375 shares[6] of its own common stock at artificially inflated prices during the three month period ended March 31, 2020.

152.    According to the Company's 2019 10-K, the Company repurchased 14,281 shares[7] of its own common stock at artificially inflated prices during the year ended December 31, 2019.

153.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company overpaid for these shares and was damaged thereby.

## DAMAGES TO EHEALTH

154.    As a direct and proximate result of the Individual Defendants' conduct, eHealth has lost and expended, and will lose and expend, many millions of dollars.

155.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and its CEO, CFO, and COO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

156.    Such losses include, but are not limited to, monies that the Company expended, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

---

[6] According to the 1Q20 10-Q, these shares were repurchased "to satisfy employee tax withholding obligations."

[7] According to the 2019 10-K, these shares were repurchased "to satisfy employee tax withholding obligations."

Verified Shareholder Derivative Complaint

157.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

158.    As a direct and proximate result of the Individual Defendants' conduct, eHealth has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

159.    Plaintiff brings this action derivatively and for the benefit of eHealth to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of eHealth, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

160.    eHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

161.    Plaintiff is, and has continuously been at all relevant times, a shareholder of eHealth. Plaintiff will adequately and fairly represent the interests of eHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

162.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

163.    A pre-suit demand on the Board of eHealth is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Flanders, Brimmer, Brooke, Goldberg, Livingston, Oliver, and Wolf (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

164.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of over $32 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

165.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or allowing certain of the Individual Defendants to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

166.    Additional reasons that demand on Defendant Flanders is futile follow. Defendant Flanders has served as a Company CEO since May 2016 and has served as a director of the Company since February 2008. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Flanders with his principal occupation, and he receives handsome compensation, including $9,798,119 during the fiscal year ended December 31, 2019. Defendant Flanders was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing press releases, most of which he personally made statements in, and the aforementioned 10-Ks and 10-Qs, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $25.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Flanders is a defendant in the Securities Class Actions. For these reasons, too, Defendant Flanders breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Brimmer is futile follow. Defendant Brimmer has served as a Company director since December 2018. She also serves as a member of the Compensation Committee, Nominating and Corporate Governance Committee, and Strategy Committee. Defendant Brimmer has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Brimmer signed, and thus personally made the false and misleading statements in, the 2019 10-K.  For these reasons, too, Defendant Brimmer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Brooke is futile follow. Defendant Brooke has served as a Company director since August 2019. She also serves as chairperson of the Government and Regulatory Affairs Committee and as a member of the Audit Committee and the Strategy Committee. Defendant Brooke has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Brooke signed, and thus personally made the false and misleading statements in, the 2019 10-K. For these reasons, too, Defendant Brooke breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Goldberg is futile follow. Defendant Goldberg has served as a Company director since June 1999. He also serves as the chairperson of the Strategy Committee and as a member of the Audit Committee. Defendant Goldberg has received and

continues to receive compensation for his role as a director as described above. As a long-time trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Goldberg signed, and thus personally made the false and misleading statements in, the 2017, 2018, and 2019 10-Ks. His insider sales before the fraud was exposed, which yielded at least $3.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Goldberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant Livingston is futile follow. Defendant Livingston has served as a Company director since December 2008. He also serves as chairperson of the Audit Committee and as a member of the Strategy Committee. Defendant Livingston has received and continues to receive compensation for his role as a director as described above. As a long-time trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Livingston signed, and thus personally made the false and misleading statements in, the 2017, 2018, and 2019 10-Ks. His insider sales before the fraud was exposed, which yielded at least $2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Livingston breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Oliver is futile follow. Defendant Oliver has served as a Company director since December 2005. He also serves as chairperson of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and the Government and Regulatory Affairs Committee. Defendant Oliver has received and continues to

receive compensation for his role as a director as described above. As a long-time trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Oliver signed, and thus personally made the false and misleading statements in, the 2017, 2018, and 2019 10-Ks. His insider sale before the fraud was exposed, which yielded at least $763,830 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Oliver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.     Additional reasons that demand on Defendant Wolf is futile follow. Defendant Wolf has served as a Company director since August 2019. He also serves as chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Wolf has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Wolf signed, and thus personally made the false and misleading statements in, the 2019 10-K. For these reasons, too, Defendant Wolf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.     Additional reasons that demand on the Board is futile follow.

174.     As described above, four of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Flanders, Goldberg, Livingston, and Oliver collectively received proceeds of over $32 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

175.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

176.    Defendants Goldberg, Livingston, and Brooke (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, the adequacy of the Company's disclosure controls and procedures, and the adequacy of the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

177.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Moreover, in violation of the Code of Conduct, the Directors failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

178.    eHealth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for eHealth any part of the

damages eHealth suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

179.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

180.    The acts complained of herein constitute violations of fiduciary duties owed by eHealth's officers and directors, and these acts are incapable of ratification.

181.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of eHealth. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of eHealth, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

182.    If there is no directors' and officers' liability insurance, then the Directors will not cause eHealth to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

183.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

184.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.     The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

186.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

187.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

188.     Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (i) eHealth utilized accounting techniques that

were highly aggressive and overstated membership lifetime modeling assumptions; (ii) the Company depended on direct response television advertising as its primary marketing tool, which attracts droves of high churn enrollees who are unprofitable; (iii) because the Company began pursuing growth that was low quality and uneconomic, the rate of eHealth membership churns sharply climbed from 2017; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

189.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to designed to "tie the pay of our Named Executive Officers to their performance and the company's performance[]" and reward executive offers if they "deliver long-term value for our stockholders[,]'"while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

190.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them, their insider trading, and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

191.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors and appointment of an independent auditor.

192.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Flanders, Goldberg, Livingston, Oliver, and/or Brimmer during the Relevant Period, which allowed them to continue breaching their fiduciary duties to eHealth.

193.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

194.    Plaintiff on behalf of eHealth has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) of the Exchange Act**

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding eHealth. Not only is eHealth now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon eHealth by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to overpay in repurchasing 18,656 of its own shares on the open market at artificially-inflated prices, damaging eHealth.

197.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

198.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about eHealth not misleading.

199.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by eHealth. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

200.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-K filed with the SEC during the Relevant Period.

201.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

202.     Plaintiff on behalf of eHealth has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Violations of Section 20(a) of the Exchange Act**

203.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.     Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the

controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action."

205.    The Individual Defendants, by virtue of their positions with eHealth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of eHealth and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause eHealth to engage in the illegal conduct and practices complained of herein.

206.    Plaintiff on behalf of eHealth has no adequate remedy at law.

**FOURTH CLAIM**

**Against Individual Defendants for Breach of Fiduciary Duties**

207.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of eHealth's business and affairs.

209.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

210.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of eHealth.

211.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

212.    In further breach of their fiduciary duties owed to eHealth, the Individual Defendants willfully or recklessly made and/or allowed certain of the Individual Defendants and the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) eHealth utilized accounting techniques that were highly aggressive and overstated membership lifetime modeling assumptions; (ii) the Company depended on direct response television advertising as

its primary marketing tool, which attracts droves of high churn enrollees who are unprofitable; (iii) because the Company began pursuing growth that was low quality and uneconomic, the rate of eHealth membership churns sharply climbed from 2017; and (iv) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

213.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

214.    In breach of their fiduciary duties, five of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing 18,656 shares of Company stock at artificially inflated prices.

215.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

216.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the

fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

217.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, eHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiff on behalf of eHealth has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, eHealth.

222.    The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from eHealth that was tied to the performance or artificially inflated valuation of eHealth, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

223.    Plaintiff, as a shareholder and a representative of eHealth, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

224.    Plaintiff on behalf of eHealth has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence eHealth, for which they are legally responsible.

227.    As a direct and proximate result of the Individual Defendants' abuse of control, eHealth has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, eHealth has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228.    Plaintiff on behalf of eHealth has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

229.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of eHealth in a manner consistent with the operations of a publicly-held corporation.

231.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, eHealth has sustained and will continue to sustain significant damages.

232.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

233.    Plaintiff on behalf of eHealth has no adequate remedy at law.

Verified Shareholder Derivative Complaint

**EIGHTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

234.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and/or stock grants, to the detriment of the shareholders and the Company.

236.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

237.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused eHealth to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

238.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

239.    Plaintiff on behalf of eHealth has no adequate remedy at law.

**PRAYER FOR RELIEF**

240.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of eHealth, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to eHealth;

(c)    Determining and awarding to eHealth the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing eHealth and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws

and to protect eHealth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of eHealth to nominate at least four candidates for election to the Board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding eHealth restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 7, 2020                   Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427

1

Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

2

3

*Counsel for Plaintiff*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Yacob Chernet am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

7/6/2020

Yacob Chernet