Robert V. Prongay (SBN 270796)
   *rprongay@glancylaw.com*
Pavithra Rajesh (SBN 323055)
   *prajesh@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE EHEALTH STOCKHOLDER DERIVATIVE LITIGATION | Master File No. 4:20-cv-04477-JST <br><br> **VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Yacob Chernet and Dharmender Badwal (together, "Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant, eHealth, Inc. ("eHealth" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and certain of its officers, including: Scott N. Flanders ("Flanders"), Derek N. Yung ("Yung"), David K. Francis ("Francis"), Andrea C. Brimmer ("Brimmer"), Beth A. Brooke ("Brooke"), Michael D. Goldberg ("Goldberg"), Randall S. Livingston ("Livingston"), Jack L. Oliver, III ("Oliver"), and Dale B. Wolf ("Wolf") (collectively, the "Individual Defendants," and together with eHealth, the "Defendants"), seeking to remedy defendants' breaches of fiduciary duties, insider trading (i.e. *Brophy* claim), violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), § 10(b) of the Exchange Act, and contribution for violations of § 10(b) of the Exchange Act. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by eHealth with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.        NATURE AND SUMMARY OF THE ACTION

1.        eHealth is an insurance broker for large insurance companies. The Company specializes in marketing Medicare-related products. In fact, the Medicare segment, which recognizes revenue from commissions received in exchange for Medicare insurance plans, generates the majority of the Company's revenue.

2.        On January 1, 2018, the Company began recognizing its revenue under Accounting Standards Update 2014-09, *Revenue from Contracts with Customers*, known as "ASC 606." Following its adoption of ASC 606, the Company preemptively recognized revenue based on projected estimates attached to enrollees' purported membership lifetimes utilized in eHealth's long-term value ("LTV") models. Accordingly, following approval of a Medicare Advantage policy, eHealth would recognize three-years' worth of revenue based forecasted commissions.

3.      Between April 26, 2018 and July 23, 2020 (the "Relevant Period"), the Individual Defendants made and/or caused eHealth to make materially false and misleading statements and omissions in filings with the SEC and during earnings calls with investors regarding eHealth's business and financial prospects. Specifically, the Individual Defendants claimed, among other things, that there were no additional costs associated with eHealth's Medicare services, thereby allowing the Company to recognize multiple years of expected revenue upfront and in full once an applicant was approved. In truth, eHealth had significant operating expenses that negatively impacted the commissions received from insurers. Given that such operating costs would need to be deducted from any commissions, the Company's statements, and representations that there were, *inter alia*, "no other cost associated" with eHealth's revenue recognition beyond reconciling incoming cash and cash that should be paid as a broker record created a false image of eHealth's financial state and artificially inflated the price of eHealth's stock. The Individual Defendants also failed to maintain internal controls over eHealth's financial reporting and disclosures.

4.      During the Relevant Period, eHealth's stock price skyrocketed, from trading at $15.57 per share on April 25, 2018 to a peak of over $146 per share before April 7, 2020, when the truth began to emerge. The Individual Defendants profited off eHealth's inflated stock price by way of millions of dollars in equity-based compensation and illicit insider sales. Flanders, Francis, and Yung specifically received more than $15 million in performance-based awards of restricted stock units ("RSUs") triggered off the Company's rising stock prices. The Company was also able to secure substantial financing from stock offerings that it otherwise would not have been able to receive had investors been aware of the true state of eHealth's financial prospects.

5.      Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.  Upon information and belief, during the fiscal year ended December 31, 2020, 215,000 shares of the Company's common stock were repurchased at inflated prices during the for an aggregate total of $19.8 million.

6.      On April 7, 2020, Muddy Waters Capital published a report alleging, among other things, that eHealth's "highly aggressive accounting masks . . . a significantly unprofitable

1  business," "that the key driver of growth since 2018 has been EHTH's reliance on Direct Response

2  television marketing, which attracts an unprofitable, high churn enrollee," and that the Company's

3  accounting assumptions "seem highly aggressive when compared to reality." The report also alleged

4  that the Company had overstated fiscal 2019 revenue by $128 million, overstated operated profit by

5  $263 million, and understated its operating loss of $181 million.

6      7.    On this news, the Company's stock price fell from $130.57 to close at $116.90 per

7  share on April 7, 2020.

8      8.    On July 23, 2020, eHealth reported its second quarter 2020 financial results,

9  corroborating the Muddy Waters report's contentions that eHealth had significantly exaggerated

10  revenue from commissions.

11      9.    On this news, the Company's stock price fell 30.5%, or $34.83, to close at $79.17

12  per share on July 24, 2020.

13      10.    These revelations precipitated the filing of a securities class action in this District

14  against eHealth and certain of the Individual Defendants, captioned *In re eHealth Inc. Sec. Litig.*,

15  Case No. 4:20-cv-02395-JST (the "Securities Class Action").

16      11.    On August 12, 2021, Judge Jon S. Tigar denied-in-part defendants' motion to dismiss

17  the Securities Class Action, holding that a claim for securities fraud had been stated against eHealth

18  and certain of its officers related to the same statements set forth herein. It is now a virtual certainty

19  that eHealth will incur significant liability due to the fiduciary breaches committed by defendants

20  when they issued misleading statements about the Company's revenue prospects.

21      12.    Plaintiffs did not make a litigation demand prior to filing this action because such

22  demand would have been futile based upon the composition of the Board and the actions taken by

23  the Board.  At the time Plaintiffs initiated this action, the Board consisted of seven directors, all

24  named as Individual Defendants herein.  As alleged herein, Flanders as Chief Executive Officer

25  ("CEO") and Goldberg, Livingston, and Brooke, as members of the Audit Committee, knew that

26  there were additional costs associated with the Company's services yet allowed misleading

27  statements about revenue and revenue recognition to be disseminated.  Moreover, Flanders,

28  Goldberg, and Livingston sold over $28 million in eHealth stock while in possession of material

1  nonpublic information.  Thus, more than half the members would have been interested in a demand
2  to investigate their own wrongdoing.

3  **II.    JURISDICTION AND VENUE**

4      13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this
5  Complaint states a federal question: violations of Sections 10(b) and 14(a) of the Exchange Act.
6  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28
7  U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United
8  States which it would not otherwise have.

9      14.    Additionally, the Court has subject matter jurisdiction over this action pursuant to 28
10 U.S.C. § 1332(a)(2) because no plaintiff and defendant are domiciled in the same state, and the
11 amount in controversy, exceeds $75,000.

12     15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a
13 substantial portion of the transactions and wrongs complained of herein occurred in this District,
14 and the Defendants have received substantial compensation in this district by engaging in numerous
15 activities that had an effect in this District.

16 **III.    PARTIES**

17 **Plaintiffs**

18     16.    Plaintiff Yacob Chernet is a current shareholder of eHealth. Plaintiff Yacob Chernet
19 has continuously held eHealth common stock at all relevant times.  He is a citizen of Indiana.

20     17.    Plaintiff Dharmender Badwal is a current shareholder of eHealth. Plaintiff
21 Dharmender Badwal has continuously held eHealth common stock at all relevant times.  He is a
22 citizen of Canada.

23 **Nominal Defendant**

24     18.    Nominal Defendant eHealth is a Delaware corporation with its principal executive
25 offices located at 2625 Augustine Drive, Second Floor, Santa Clara, CA 95054.  The Company's
26 stock trades on the NASDAQ exchange under the symbol "EHTH."

27

28

1    **Defendants**

2        19.    Defendant Flanders served as CEO of the Company from May 2016 until November

3    2021 and as a director of the Company from February 2008 until November 2021. He is named as

4    a defendant in the Securities Class Action. Defendant Flanders received lucrative compensation

5    during the Relevant Period, primarily in the form of equity. For the fiscal year ended December 31,

6    2020, Defendant Flanders received $11,809,419 in compensation from the Company. For the fiscal

7    year ended December 31, 2019, Defendant Flanders received $9,798,119 in compensation from the

8    Company. For the fiscal year ended December 31, 2018, Defendant Flanders received $3,498,356

9    in compensation from the Company. Upon information and belief, Defendant Flanders is a citizen

10   of the State of California.

11       20.    Defendant Yung served as Chief Financial Officer ("CFO") of the Company from

12   June 2018 until June 2021. He is named as a defendant in the Securities Class Action. Defendant

13   Yung received lucrative compensation during the Relevant Period, primarily in the form of equity.

14   For the fiscal year ended December 31, 2020, Defendant Yung received $3,310,022 in compensation

15   from the Company. For the fiscal year ended December 31, 2019, Defendant Yung received

16   $4,710,908 in compensation from the Company. For the fiscal year ended December 31, 2018,

17   Defendant Yung received $2,680,219 in compensation from the Company. Upon information and

18   belief, Defendant Yung is a citizen of the State of California.

19       21.    Defendant Francis has served as Chief Operating Officer ("COO") of the Company

20   from January 2018 until August 2020, and was the CFO of eHealth between July 2016 and June

21   2018. He is named as a defendant in the Securities Class Action. Defendant Francis received

22   lucrative compensation during the Relevant Period, primarily in the form of equity. For the fiscal

23   year ended December 31, 2019, Defendant Francis received $5,745,848 in compensation from the

24   Company. For the fiscal year ended December 31, 2018, Defendant Francis received $1,726,416 in

25   compensation from the Company. Upon information and belief, Defendant Francis is a citizen of

26   the State of California.

27       22.    Defendant Brimmer has served as a director of the Company since December 2018.

28   She also served on the Compensation Committee, Nominating and Corporate Governance

Committee, and Strategy Committee during the Relevant Period. During the Relevant Period, Defendant Brimmer received compensation from the Company, primarily in the form of equity. For the fiscal year ended December 31, 2020, Defendant Brimmer received $249,573 in compensation from the Company. For the fiscal year ended December 31, 2019, Defendant Brimmer received $205,073 in compensation from the Company. For the fiscal year ended December 31, 2018, Defendant Brimmer received $147,754 in compensation from the Company. Upon information and belief, Defendant Brimmer is a citizen of the State of Michigan.

23.    Defendant Brooke has served as a director of the Company since August 2019. She also served as a member of the Audit Committee, Government and Regulatory Affairs Committee, and Strategy Committee during the Relevant Period. During the Relevant Period, Defendant Brooke received compensation from the Company, primarily in the form of equity. For the fiscal year ended December 31, 2020, Defendant Brooke received $257,073 in compensation from the Company. For the fiscal year ended December 31, 2019, Defendant Brooke received $161,458 in compensation from the Company. Upon information and belief, Defendant Brooke is a citizen of the State of Pennsylvania.

24.    Defendant Goldberg served as a director of the Company from June 1999 until December 2021. He served as a member of the Audit Committee and as chairperson of the Strategy Committee during the Relevant Period. During the Relevant Period, Defendant Goldberg also received compensation from the Company, primarily in the form of equity. For the fiscal year ended December 31, 2020, Defendant Goldberg received $254,573 in compensation from the Company. For the fiscal year ended December 31, 2019, Defendant Goldberg received $220,698 in compensation from the Company. For the fiscal year ended December 31, 2018, Defendant Goldberg received $227,928 in compensation from the Company. Upon information and belief, Defendant Goldberg is a citizen of the State of California.

25.    Defendant Livingston has served as a director of the Company since December 2008. He also served as a member of the Audit Committee and Government and Regulatory Affairs Committee during the Relevant Period. During the Relevant Period, Defendant Livingston received compensation from the Company, primarily in the form of equity. For the fiscal year ended

December 31, 2020, Defendant Livingston received $259,573 in compensation from the Company. For the fiscal year ended December 31, 2019, Defendant Livingston received $222,698 in compensation from the Company. For the fiscal year ended December 31, 2018, Defendant Livingston received $228,928 in compensation from the Company. Upon information and belief, Defendant Livingston is a citizen of the State of California.

26.    Defendant Wolf has served as a director of the Company since August 2019. Defendant Wolf also served as a member of the Nominating and Corporate Governance Committee and as chairperson of the Compensation Committee during the Relevant Period. During the Relevant Period, Defendant Wolf also received compensation from the Company, primarily in the form of equity. For the fiscal year ended December 31, 2020, Defendant Wolf received $249,573 in compensation from the Company. For the fiscal year ended December 31, 2019, Defendant Wolf received $180,247 in compensation from the Company. Upon information and belief, Defendant Wolf is a citizen of the State of Florida.

27.    Defendant Oliver served as a director of the Company from December 2005 to May 2021. Defendant Wolf also served as a member of the Nominating and Corporate Governance Committee and as chairperson of the Compensation Committee. During the Relevant Period, Defendant Goldberg also received compensation from the Company, primarily in the form of equity. For the fiscal year ended December 31, 2020, Defendant Oliver received $287,073 in compensation from the Company. For the fiscal year ended December 31, 2019, Defendant Oliver received $227,573 in compensation from the Company. For the fiscal year ended December 31, 2018, Defendant Oliver received $217,928 in compensation from the Company. Upon information and belief, Defendant Oliver is a citizen of the State of Missouri.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

28.    By reason of their positions as officers, directors, and/or fiduciaries of eHealth and because of their ability to control the business and corporate affairs of eHealth, at all relevant times, the Individual Defendants owed eHealth and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage eHealth in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in

furtherance of the best interests of eHealth and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to eHealth and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of eHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with eHealth, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

30.    To discharge their duties, the officers and directors of eHealth were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of eHealth were required to, among other things:

a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

d.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

31.    eHealth is an insurance broker for large insurance companies. The Company has two business segments: (1) Medicare, and (2) Individual, Family and Small Business, with eHealth's Medicare segment representing the majority of its business. The Medicare segment, which recognizes revenue from commissions received in exchange for Medicare insurance plans, generates the majority of the Company's revenue. For fiscal years 2017, 2018, and 2019, the Medicare segment accounted for 70%, 75%, and 80%, respectively, of the Company's revenue. Moreover, approximately 55% of eHealth's commission revenue is derived from three companies, Humana, Aetna, and UnitedHealthcare.

32.    Historically, eHealth recognized commission revenue on an annual basis when the carrier reported the annual or first monthly commission amount for the plan year, net of an estimate of future forfeited amounts due to cancellations. For commissions paid on a monthly basis, eHealth recorded a receivable for the amount to be received over the remainder of the year, net of an estimate of future forfeited amounts.

33.    Then, when eHealth adopted a new accounting standard, the Company started to recognize multiple years' of commission revenue upfront. Specifically, ASU 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("ASC 606"), requires entities to recognize revenue that they reasonably expect to receive over the life of the contract. As a result, once an applicant was approved, eHealth recognized multiple years of revenue upfront based on internal estimates for the life of the policy. The shift in eHealth's revenue recognition practices resulted in greater reported revenues and served as an important focus for investors when deciding what the Company was worth. At the time that eHealth began implementing ASC 606, the Company was facing stagnant growth. In 2018, ASC 606 provided an avenue for the Individual Defendants to pursue quantitative growth gleaned through direct response television advertising, at the expense of qualitative growth.

34.    Thus, eHealth recognized an upfront amount of revenue equal to the current commission rates multiplied by the number of years expected for the policy, which in turn resulted in the policy's "constrained lifetime value" or LTV. LTV is based on several factors, including

conversions rates for approved members into paying members, forecasted member churn (i.e., expected rate of cancellation), and forecasted commission amounts per approved member. The Company used historical sales information to calculate LTVs and updated such calculations on a quarterly basis.

35.     Notably, eHealth also incurred hefty operating costs and expenses that the Company was required to deduct from any revenue obtained from commissions. In fact, the Company's commissions ranged between $158 million to $466 million per year, approximately. Operational expenses ranged from $200 million to $400 million per year, approximately. Operational expenses specifically related to customer care and enrollment spanned between $48 million and $134 million annually. However, due to materially false and misleading statements and omissions that indicated otherwise (i.e., that no such costs existed), the investing public was left with an impression of eHealth's financial state and prospects that was significantly removed from reality. Due to the Board's failure to maintain internal controls and to correct and/or appropriately oversee eHealth's disclosures and governance, the Individual Defendants were able to reap unearned or otherwise improper benefits tied to eHealth's inflated stock price.

**B.     The Individual Defendants Caused the Company to Issue Materially Misleading Statements**

36.     On March 19, 2018, the Individual Defendants caused eHealth to file its annual report on Form 10-K for the period ended December 31, 2017 (the "2017 10-K"). It was signed by Defendants Flanders, Francis, Goldberg, Livingston, and Oliver. In relevant part, the 2017 10-K report stated:[1]

> The adoption of the new standard will have a material impact to our opening balance sheet as of January 1, 2016 due to the cumulative effect of adopting the standard using the full retrospective method. In addition, our adoption of the new standard will have a material impact on our commission revenue and, as a result, on our consolidated balance sheets and consolidated statements of comprehensive income (loss) as of and for the years ended December 31, 2016 and 2017. ***Under the new standard, since our services associated with Medicare-related, individual and family and ancillary health insurance plans are complete once an application is approved by a carrier,*** *we will recognize Medicare-related, individual and family and ancillary health insurance plan **commission revenue at the time the plan is approved by the carrier equal to the estimated commissions we expect to collect on the plan. The estimated commissions we expect to collect on a plan and that we***

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

***will recognize as revenue upon approval of the application will vary based on product type and other factors, such as the estimated commission rates and the estimated life of the respective policies.*** These estimates will change with our actual experience after adoption.

37.     The above statements in ¶ 36 were materially misleading because they failed to disclose: (i) that eHealth incurred costs in maintaining and retaining customers; (ii) that, as a result, eHealth had operating costs, including customer care service and enrollment costs, that must be offset against any commissions receivable.

38.     On April 26, 2018, the Company held a conference call in connection with its first quarter 2018 financial results. During the call, an analyst sought to clarify that the Company's short- and long-term receivables are "basically equivalent," representing "receivables that [eHealth] will be receiving cash for under that constrained assumption," and whether there were "any other real costs." In response, Defendant Flanders replied:

> No, the costs attached to each of the receivable balances have essentially been absorbed as we generate the revenue in any particular quarter. ***So as the cash comes in, there is no additional cost attached to that. And the reason that those receivables are there is because there is no meaningful service component attached to them either.*** So according to our contracts with the carriers, these are all cash collection expectations that we have, both in the short term and long term.

39.     The above statements in ¶ 38 were materially misleading because they failed to disclose: (i) that eHealth incurred costs in maintaining and retaining customers; (ii) that, as a result, eHealth had operating costs, including customer care service and enrollment costs, that must be offset against any commissions receivable.

40.     On April 29, 2019, Defendants Flanders, Yung, Francis, Brimmer, Goldberg, Livingston, and Oliver issued a definitive proxy statement on Schedule 14A filed with the SEC soliciting stockholder votes in advance of the Company's annual meeting to be held June 11, 2019 (the "2019 Proxy Statement"). In the 2019 Proxy Statement, these seven Defendants solicited stockholder votes in favor of four management proposals including: (i) a proposal to elect Flanders and Goldberg to new terms as directors; and (ii) a proposal to amend the 2014 Equity Incentive Plan (the "2014 Plan") to increase the number of shares authorized for issuance thereunder by 2.5 million shares.

41.    The 2019 Proxy Statement disclosed that the Board had determined that defendant Flanders was not independent.

42.    Regarding oversight over financial reporting, the 2019 Proxy Statement stated:

Among other duties, our audit committee:

- appoints a firm to serve as independent accountant to audit our financial statements;

- discusses the scope and results of the audit with the independent accountant and reviews with management and the independent accountant our interim and year-end operating results;

- reviews the adequacy of our internal accounting controls and audit procedures;

- approves (or, as permitted, pre-approves) all audit and non-audit services to be performed by the independent accountant; and

- prepares the report that the Securities and Exchange Commission requires in our annual proxy statement.

43.    The 2014 Plan authorizes the issuance of shares of the Company's common stock for equity awards to eHealth's employees and directors. As of April 15, 2019, a total of 556,698 shares remained available for future grant pursuant to the plan. Equity pursuant to the 2014 Plan is effectively awarded at the discretion of the Board, as the proxy statement discloses: "The compensation committee has the complete discretion to make all decisions relating to the Equity Plan."

44.    The 2019 Proxy Statement solicited shareholder approval of an amendment to the 2014 Plan to increase the number of shares of common stock reserved for issuance thereunder by 2.5 million shares. If approved, the total number of shares reserved for issuance would be 3,056,698, which represents 13.5% of the Company's common stock outstanding as of April 15, 2019.

45.    The 2019 Proxy Statement was materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to oversight of the Company's financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation and that eHealth failed to maintain internal controls. A reasonable shareholder would have found the truth to be material when deciding to vote

for or against these proposals.

46.     The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "tie the pay of our Named Executive Officers to their performance and that of the company []" and reward executive officers if they "deliver long-term value for our stockholders[,]'" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. Specifically, the 2019 Proxy Statement discussed the "2019 Executive Bonus Plan" approved by the Compensation Committee which "provided executives the opportunity to earn cash bonus awards based on achieving performance goals relating to company performance established by the compensation committee."

47.     The 2019 Proxy Statement further stated: "[c]onsistent with the compensation committee's philosophy of linking pay directly to performance, the compensation committee determined to increase Mr. Flanders' variable, at-risk cash compensation rather than his base salary in 2019. Under Mr. Flanders' leadership, we have performed significantly better than our peer companies, both in terms of financial and stock price performance."

48.     On June 14, 2019, eHealth filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In particular: (i) Flanders and Goldberg were reelected to new terms as directors; and (ii) the amendment to the 2014 Plan was approved by stockholders. The reelection of these two directors and the approval of the 2014 Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of them at the expense of the Company's unaffiliated stockholders.

49.     On February 20, 2020, the Company held a conference call in connection with its fourth quarter and full year 2019 financial results. During the call, defendants Flanders and Yung misrepresented eHealth's costs associated with its services:

Charles Gregory Peters Raymond James & Associates, Inc.

Okay. The final question would be, I know you highlighted the substantial growth in your commission receivable, both current and noncurrent. Can you talk about -- and I know you mentioned some of this in your prepared remarks, can you talk about the expense associated with that receivable? Maybe the biggest piece would be the noncurrent. Is there any expense associated with that? Or is that pure, pure cash?

Derek N. Yung

So the commission receivable represents the cash collections to be collected associated with the commissions that we earn from carriers for the policies that we help acquire customers for them on their behalf. So once that's happened, and it's actually the reason why we recognize the revenue we do, our service obligation is completed, and therefore, we recognize the lifetime value of that. ***From an operating perspective,*** other than reconciling the cash coming in and the cash that we should be being paid as a broker record, ***there's no other cost associated***.

Scott N. Flanders

There's no cost against it, Greg. It's all -- the costs have been expensed in period. And it's ***all cash to be collected free of additional charge.***

50.     The above statements in ¶ 49 were materially misleading because they failed to disclose: (i) that eHealth incurred costs in maintaining and retaining customers; (ii) that, as a result, eHealth had operating costs, including customer care service and enrollment costs, that must be offset against any commissions receivable.

### C.     The Truth Begins to Emerge

51.     On April 7, 2020, Muddy Waters Capital published a report alleging, among other things, that eHealth's "highly aggressive accounting masks . . . a significantly unprofitable business," "that the key driver of growth since 2018 has been EHTH's reliance on Direct Response television marketing, which attracts an unprofitable, high churn enrollee," and "that EHTH's persistence assumptions in its LTV model [under ASC 606] seem highly aggressive when compared to reality." The report also alleged that the Company had overstated fiscal 2019 revenue by $128 million, overstated operated profit by $263 million, and understated its operating loss of $181 million.

52.     The Muddy Waters report further alleged that "growth rates of 25.8% and 88.3%" in 2018 and 2019 respectively were due to television advertising, which "helped lower the acquisition cost per enrollee." However, it "draws in less sticky members, who [were] on the whole quite

unprofitable." As a result, "churn rate [increased] from 36.9% in 2017 to 45.6% in 2018 and then 47.0% in 2019." The report alleged that eHealth had recently changed its LTV model to "heavily weight[] the prior three years in determining the life assumption, assuring that 2017 remains relevant for another year."

53.     Therefore, the Muddy Waters report alleged, eHealth's model used "an overly optimistic [Medicare Advantage] member persistence assumption, which has a material impact on profitability (or lack thereof) of an enrollee." Though eHealth booked three years of future sales, "it should expect to lose 47% of its members over the first year post-sale." Due to this implied churn, "the implied [remaining] life is 2.1 years," for its 2019 Medicare Advantage members, but eHealth assumes that those "customers' total lives are well above 3.35 years."

54.     Moreover, the Muddy Waters report alleged that eHealth "pretends that ongoing service needs, which carry real costs, do not exist." To apply ASC 606, "book[ing] multiple years of commission revenue by claiming that no further performance on its part is necessary in order to collect these commissions."

55.     On this news, the Company's stock price fell from $130.57 to close at $116.90 per share on April 7, 2020.

56.     On April 28, 2020, Defendants Flanders, Goldberg, Brimmer, Brooke, Livingston, Oliver, and Wolf issued a definitive proxy statement on Schedule 14A filed with the SEC soliciting stockholder votes in advance of the Company's annual meeting to be held June 9, 2020 (the "2020 Proxy Statement"). In the 2020 Proxy Statement, these seven Defendants solicited stockholder votes in favor of five proposals including: (i) a proposal to elect Brimmer, Brooke, and Livingston to new terms as directors; and (ii) a proposal to adopt the 2020 Employee Stock Purchase Plan (the "2020 Plan") adopted by the Board in March 2020, subject to approval, which reserved 500,000 shares of common stock out of eHealth's 25,611,990 total outstanding stock for employees to purchase subject to several provisos. Notably, the 2020 Plan would not apply to eHealth officers and would be controlled exclusively by the Board.

57.     The 2020 Proxy Statement disclosed that the Board had determined that defendant Flanders was not independent.

58.     Regarding oversight over financial reporting, the 2020 Proxy Statement stated:

Among other duties, our audit committee:

- appoints a firm to serve as independent accountant to audit our financial statements;

- discusses the scope and results of the audit with the independent accountant and reviews with management and the independent accountant our interim and year-end operating results;

- reviews the adequacy of our internal accounting controls and audit procedures;

- approves (or, as permitted, pre-approves) all audit and non-audit services to be performed by the independent accountant; and

- prepares the report that the Securities and Exchange Commission requires in our annual proxy statement.

59.     The 2020 Proxy Statement was materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to oversight of the Company's financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) solicited the approval of the 2020 Plan, which was exclusively controlled by the Board, while failing to disclose that eHealth failed to maintain internal controls. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

60.     The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including the "2019 Executive Bonus Plan" approved by the Compensation Committee which "provided executives the opportunity to earn cash bonus awards based on achieving performance goals relating to company performance established by the compensation committee." The 2020 Proxy Statement further stated:

In the case of all Named Executive Officers, company performance under the 2019 Bonus Program was measured by the achievement of specific financial goals related to revenue and adjusted EBITDA. Adjusted EBITDA was calculated by adding stock-based compensation, depreciation and amortization expense, acquisition costs, restructuring charge, amortization of intangible assets, change in fair value of earnout liability, other income, net and provision for income taxes to GAAP net income

61.    However, the 2020 Proxy Statement failed to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein and that certain of the Individual Defendants were motivated to engage and/or allow the dissemination of false and misleading statements in order to trigger lucrative bonus awards per the Board approved compensation program.

62.    On June 15, 2020, eHealth filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the 2020 Proxy Statement. In particular: (i) Brimmer, Brooke, and Livingston were reelected to new terms as directors; and (ii) the 2020 Plan was approved by stockholders. The reelection of these three directors and the approval of the 2020 Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of them at the expense of the Company's unaffiliated stockholders.

63.    On July 23, 2020, eHealth reported its second quarter 2020 financial results, reporting that member churn in Medicare Advantage customers had spiked to 42%, corroborating the Muddy Waters report.

64.    On this news, the Company's stock price fell 30.5%, or $34.83, to close at $79.17 per share on July 24, 2020.

**D.    Defendants Materially Benefit Off eHealth's Artificially Inflated Stock Price**

       **1.    Defendants Flanders, Francis, Goldberg, and Livingston Sold Over $32 Million in eHealth Stock While in Possession of Material Non-Public Information**

Flanders

65.    Defendant Flanders served as the Company's CEO during the Relevant Period and had a highly sophisticated understanding of the Company's results and their import.

66.    As set forth herein, defendant Flanders possessed material negative information which he knew was being concealed from investors.  Defendant Flanders consciously acted to exploit his knowledge by selling over $22.5 million of eHealth stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/30/2019 | 11,094 | $101.64 | $1,127,594 |
| 7/30/2019 | 13,484 | $103.81 | $1,399,774 |
| 7/30/2019 | 39,221 | $104.81 | $4,110,753 |
| 7/30/2019 | 23,758 | $105.53 | $2,507,182 |
| 7/30/2019 | 1,300 | $106.38 | $138,294 |
| 1/22/2020 | 31,722 | $100.28 | $3,181,082 |
| 1/24/2020 | 24,478 | $111.54 | $2,730,276 |
| 1/24/2020 | 8,739 | $112.47 | $982,875 |
| 1/24/2020 | 19,859 | $113.29 | $2,249,826 |
| 1/24/2020 | 14,393 | $114.22 | $1,643,968 |
| 1/24/2020 | 21,009 | $115.28 | $2,421,918 |
| 1/24/2020 | 800 | $116.07 | $92,856 |
| | **209,857** | | **$22,586,398** |

67.    Defendant Flanders thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

<u>Francis</u>

68.    Defendant Francis served as the Company's COO during the Relevant Period and had a highly sophisticated understanding of the Company's results and their import.

69.    As set forth herein, defendant Francis possessed material negative information which he knew was being concealed from investors.  Defendant Francis consciously acted to exploit his knowledge by selling nearly $3.6 million worth of eHealth stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/30/2019 | 1,000 | $103.00 | $103,000 |
| 8/12/2019 | 2,000 | $109.54 | $219,080 |
| 6/2/2020 | 5,954 | $130.64 | $777,830 |
| 6/2/2020 | 16,874 | $131.50 | $2,218,931 |
| 6/2/2020 | 2,172 | $132.17 | $288,267 |
| | **28,000** | | **$3,607,108** |

70.    Defendant Francis thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

<u>Goldberg</u>

71.    Defendant Goldberg served as a director of the Company with a highly sophisticated understanding of the Company's results and their import. According to the Company's 2021 proxy

statement, Goldberg was an "audit committee financial expert" as defined in the SEC rules.

72. As set forth herein, defendant Goldberg possessed material negative information which he knew was being concealed from investors. Defendant Goldberg consciously acted to exploit his knowledge by selling over $3.2 million of eHealth stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/21/2019 | 4,057 | $102.21 | $414,665 |
| 8/22/2019 | 7,013 | $102.14 | $716,307 |
| 8/22/2019 | 9,404 | $97.16 | $913,692 |
| 8/22/2019 | 900 | $97.96 | $88,164 |
| 8/22/2019 | 800 | $102.00 | $81,600 |
| 4/30/2020 | 2,000 | $110.00 | $220,000 |
| 5/5/2020 | 2,000 | $110.00 | $220,000 |
| 5/7/2020 | 4,750 | $115.00 | $546,250 |
| | **30,924** | | **$3,200,678** |

73. Defendant Goldberg thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Livingston

74. Defendant Livingston is a director of the Company with a highly sophisticated understanding of the Company's results and their import. According to the Company's 2021 proxy statement, Livingston is an "audit committee financial expert" as defined in the SEC rules.

75. As set forth herein, defendant Livingston possessed material negative information which he knew was being concealed from investors. Defendant Livingston consciously acted to exploit his knowledge by selling over $2.8 million of eHealth stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/1/2019 | 1,561 | $101.19 | $157,957 |
| 8/1/2019 | 8,267 | $102.18 | $844,722 |
| 8/1/2019 | 2,437 | $103.27 | $251,668 |
| 8/1/2019 | 2,000 | $104.13 | $208,260 |
| 8/1/2019 | 735 | $105.11 | $77,255 |
| 6/2/2020 | 10,000 | $128.69 | $1,286,900 |
| | **25,000** | | **$2,826,762** |

76.     Defendant Livingston thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

2.      **Defendants Flanders, Francis, and Yung Obtain Millions in RSUs Triggered By eHealth's Purported Performance**

77.     The Individual Defendants were further incentivized to perpetuate the false image of eHealth's financial prospects, as several executives received payouts in the form of RSUs upon the Company achieving certain stock price thresholds. Thus, as the stock price increased, so too did the Individual Defendants' opportunities to receive lucrative awards.

78.     In addition to cash-based salary, during the Relevant Period, Flanders received $10,878,273, $8,064,027, and $2,064,856, respectively, during 2018, 2019, and 2020 in RSU performance awards. Francis received $4,902,387 and $913,362 respectively, during 2018 and 2019 in RSU performance awards. Yung received $2,807,038, $4,004,177, and 1,158,875 respectively, during 2018, 2019 and 2020 in RSU performance awards.

79.     These figures were substantial, especially in comparison to these Individual Defendants' base salaries, which were at or lower than $600,000.

**E.      Denial of Motion to Dismiss the Securities Class Action**

80.     On August 12, 2021, U.S. District Judge Jon S. Tigar issued an order denying-in-part defendants' motion to dismiss the Securities Class Action. *See generally In re eHealth Inc. Sec. Litig.*, 2021 WL 5855864 (N.D. Cal. Aug. 12, 2021). Among other things, the order found that "a reasonable investor could have been misled by the [defendants'] statements into believing, incorrectly, that eHealth did not have to incur any costs that had to be offset against the commissions it expected to receive from insurance companies." *Id.* at *8. Specifically, "eHealth had to incur operational costs, including expenses to retain high-churn direct-response members, and . . . these costs had to be deducted from its commissions receivable." *Id.* at *9. With respect to scienter, the Court held that:

> when considered holistically, raise the reasonable inference that individual Defendants[] acted with at least deliberate recklessness when making the April 26, 2018, and February 20, 2020, challenged statements, which, as discussed above, created the false impression that eHealth did not have operational expenses that needed to be offset against its commissions receivable. eHealth's operational expenses, which individual Defendants failed to mention or acknowledge when

making the challenged statements, were significant relative to eHealth's commission revenue.

*Id.* at *11. The Court maintained in the order that further support for scienter included that the defendants had motives to "inflate eHealth's stick price because their compensation and their ability to profit from sales of their eHealth stock depended on eHealth's financial performance. *Id.* The Court found that plaintiff had adequately made a claim for violations of Sections 10(b) and 20(a) of the Exchange Act based on certain of the misrepresentations also set forth herein.

**F.    Repurchases During the Relevant Period**

81.    Upon information and belief, during the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

82.    According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2020 filed with the SEC on February 26, 2021 ("2020 10-K"), the Company repurchased 215,000 shares[2] of its own common stock for $19,808,000 during the 2020 fiscal year. Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company overpaid for these shares by approximately $12.96 per share and over $2.7 million collectively and was damaged thereby.[3]

**VI.    DAMAGES TO THE COMPANY**

83.    As a direct and proximate result of the Individual Defendants' conduct, eHealth has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.    Legal fees incurred in connection with the Securities Class Action;

b.    Any funds paid to settle the Securities Class Action;

c.    The issuance of 2.5 million shares to the 2014 Equity Incentive Plan pursuant to the misleading 2019 Proxy Statement; and

---

[2] According to the 2020 10-K, these shares were repurchased "to satisfy employee tax withholding obligations."

[3] In truth, the price per share was actually only worth $79.17 per share, the price at close on July 24, 2020.

1             d.     Costs incurred from compensation and benefits paid to the defendants who

2    have breached their duties to eHealth.

3           84.     In addition, eHealth's business, goodwill, and reputation with its business partners,

4    regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted

5    the nature of its false statements and the true condition of its business.  The credibility and motives

6    of management are now in serious doubt.

7           85.     The actions complained of herein have irreparably damaged eHealth's corporate

8    image and goodwill.  For at least the foreseeable future, eHealth will suffer from what is known as

9    the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

10   behavior and have misled the investing public, such that eHealth's ability to raise equity capital or

11   debt on favorable terms in the future is now impaired.

12   **VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

13          86.     Plaintiffs bring this action derivatively in the right and for the benefit of eHealth to

14   redress injuries suffered, and to be suffered, by eHealth as a direct result of the wrongdoing alleged

15   herein.  eHealth is named as a nominal defendant solely in a derivative capacity.  This is not a

16   collusive action to confer jurisdiction on this Court that it would not otherwise have.

17          87.     Plaintiffs will adequately and fairly represent the interests of eHealth in enforcing

18   and prosecuting its rights.

19          88.     Plaintiffs have continuously been shareholders of eHealth at times relevant to the

20   wrongdoing complained of and are current eHealth shareholders.

21          89.     When this action was filed,[4] eHealth's Board consisted of seven directors: defendants

22   Flanders, Brimmer, Brooke, Goldberg, Livingston, Oliver, and Wolf (the "Directors").  Plaintiffs

23   did not make any demand on the Board to institute this action because such a demand would be a

24   futile, wasteful, and useless act, for the reasons set forth below.

25          90.     Demand is excused as to all of the Directors because each one of them faces,

26   individually and collectively, a substantial likelihood of liability as a result of the scheme they

27

28   _____

[4] The first action in this consolidated case was filed on July 7, 2020.

1  engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading

2  statements and omissions of material facts, while three of them engaged in insider sales based on

3  material non-public information, netting proceeds of over $28 million, which renders them unable

4  to impartially investigate the charges and decide whether to pursue action against themselves and

5  the other perpetrators of the scheme.

6        91.    In complete abdication of their fiduciary duties, the Directors either knowingly or

7  recklessly participated in making and/or allowing certain of the Individual Defendants to make the

8  materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*,

9  intended to make the Company appear more profitable and attractive to investors. As a result of the

10  foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are

11  not disinterested, and demand upon them is futile, and thus excused.

           **A.**      **Defendant Flanders**

13        92.    At all relevant times, Flanders was the Company's CEO, and therefore was not

14  independent under NASDAQ listing rules.  As an employee, Flanders derived substantially all of

15  his income from his employment with eHealth, thus could not disinterestedly consider a demand for

16  action that might require him to sue the directors that control his continued employment and/or

17  fellow members of management with whom he works on a day-to-day basis. Indeed, as set forth

18  above, Flanders materially benefited millions of dollars directly in connection with eHealth's

19  inflated stock price, including by way of improper insider sales. Moreover, as CEO, Flanders

20  personally issued the misleading statements alleged herein, and a motion to dismiss the Securities

21  Class Action by him was denied.  As a result, Flanders would be interested in a demand regarding

22  his own wrongdoing, and demand is futile as to him.

           **B.**      **Defendants Goldberg, Livingston, and Brooke**

24        93.    Goldberg, Livingston, and Brooke served as the members of the Audit Committee at

25  all relevant times.  As such, they were responsible for the effectiveness of the Company's internal

26  controls, the integrity of its financial statements, and its compliance with laws and regulations.  In

27  their capacities as Audit Committee members, Goldberg, Livingston, and Brooke reviewed and

28  approved the Company's disclosures, including recognition of revenue under ASC 606 and

consideration of continuing service costs.  As alleged herein, Goldberg, Livingston, and Brooke failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in eHealth's SEC filings and other disclosures.  Thus, Goldberg, Livingston, and Brooke breached their fiduciary duties and are not disinterested, and demand is excused as to them.

94.    Like Flanders, Goldberg and Livingston further breached their fiduciary duties by utilizing material non-public information to profit off eHealth's inflated stock price by way of insider sales made during the Relevant Period.

**C.    Defendants Brimmer, Flanders, Goldberg, Livingston, and Oliver**

95.    Brimmer, Flanders, Goldberg, Livingston, and Oliver were members of the Board who affirmatively caused the Company to solicit shareholder votes in the 2019 Proxy Statement. The 2019 Proxy Statement, while seeking shareholder approval for the issuance of 2.5 million new shares into the 2014 Plan, concealed the wrongdoing alleged herein and that the officers who would be compensated with the newly approved shares were breaching their fiduciary duties and misleading shareholders.  As a result, Brimmer, Flanders, Goldberg, Livingston, and Oliver face a substantial likelihood of liability due to the issuance of the misleading proxy statement and demand is excused as to them.

**D.    Defendants Flanders, Brimmer, Brooke, Goldberg, Livingston, Oliver, and Wolf**

96.     In similar vein, the Directors all solicited the 2020 Proxy Statement, which contained materially false and misleading statements. Moreover, each of Flanders, Brimmer, Brooke, Goldberg, Livingston, and Wolf managed the Company and was affirmatively aware of significant developments in its core business.  The Company's Medicare services generate a majority of the Company's revenue.  Accordingly, knowledge of the truth regarding the Medicare services business was known by each of Flanders, Brimmer, Brooke, Goldberg, Livingston, and Wolf at all relevant times.  The decisions of each the Directors to permit misleading statements, the concealment of material facts, and stock repurchases at inflated prices were not valid exercises of business judgment and demand is excused on that basis

1

2

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

3    97.    Plaintiffs incorporate by reference and realleges each and every allegation contained

4    above, as though fully set forth herein.

5    98.    Each Individual Defendant owes and owed to the Company the duty to exercise

6    candor, good faith, and loyalty in the management and administration of eHealth's business and

7    affairs, particularly with respect to issues as fundamental as public disclosures.

8    99.    The Individual Defendants' conduct set forth herein was due to their intentional or

9    reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants

10   intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and

11   interests of eHealth.

12   100.   In breach of their fiduciary duties owed to eHealth, the Individual Defendants

13   willfully participated in and caused the Company to expend unnecessarily its corporate funds,

14   rendering them personally liable to the Company for breaching their fiduciary duties. They further

15   unjustly enriched themselves to the Company's detriment.

16   101.   In particular, the Individual Defendants knowingly or recklessly made untrue

17   statements and/or permitted the Company's public filings, disclosures, and statements to

18   misleadingly represent eHealth's financial prospects and operational costs.

19   102.   As a direct and proximate result of the Individual Defendants' breaches of their

20   fiduciary obligations, eHealth has sustained and continues to sustain significant damages.  Including

21   direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in

22   the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the

23   Company.

24

## COUNT II

### Against Flanders, Francis, Goldberg, and Livingston – *Brophy* Claim

26   103.   Plaintiffs incorporate by reference and realleges each and every allegation contained

27   above, as though fully set forth herein.

28

104.   As alleged above, Flanders, Francis, Goldberg, and Livingston are fiduciaries of eHealth, possessed material, non-public information of eHealth, and used that information improperly to profit from sales of eHealth stock. When Flanders, Francis, Goldberg, and Livingston directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

105.   When Flanders, Francis, Goldberg, and Livingston sold their eHealth stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of eHealth stock would be significantly lower. Flanders, Francis, Goldberg, and Livingston timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating eHealth's non-public information.

106.   Plaintiffs have no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Violations of Section 14 of the Exchange Act**

107.   Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's 2019 Proxy Statement filed on April 29, 2019, violated § 14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to oversight of the Company's financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. It further contained misrepresentations regarding eHealth's incentive compensation practices.

1      109.    In the exercise of reasonable care, defendants should have known that the statements

2  contained in the proxy statement were materially false and misleading.

3      110.    The misrepresentations and omissions in the proxy statement were material to

4  Company shareholders in voting on the proxy statement. The proxy statement solicited and obtained

5  shareholder votes for: (i) director nominees; (ii) ratification of appointment independent auditing

6  firm; (iii) executive compensation; and (iv) amendments to the 2014 Plan. The proxy statement was

7  an essential link in the accomplishment of the continuation of the Individual Defendants' continued

8  violation of their fiduciary duties.

9      111.    The Company's 2020 Proxy Statement filed on April 28, 2020, violated § 14(a) and

10  Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to oversight of the

11  Company's financial reporting while soliciting votes to reelect and compensate directors who were

12  breaching their fiduciary duties; and soliciting the 2020 Plan in which they had full access and

13  control over employees (other than officers) receiving incentive awards and; (ii) that eHealth failed

14  to maintain internal controls. It further contained misrepresentations regarding eHealth's incentive

15  compensation practices.

16      112.    The misrepresentations and omissions in the proxy statement were material to

17  Company shareholders in voting on the proxy statement. The proxy statement solicited and obtained

18  shareholder votes for: (i) director nominees; (ii) ratification of appointment independent auditing

19  firm; (iii) executive compensation; and (iv) approval of the 2020 Plan. The proxy statement was an

20  essential link in the accomplishment of the continuation of the Individual Defendants' continued

21  violation of their fiduciary duties.

22      113.    In the exercise of reasonable care, the Individual Defendants should have known that

23  the statements contained in the proxy statements were materially false and misleading.

24      114.    The Company was damaged as a result of the defendants' material

25  misrepresentations and omissions in the proxy statement.

26

27

28

## COUNT IV

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act**

115.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

116.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding eHealth. Not only is eHealth now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon eHealth by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to overpay in repurchasing 215,000 of its own shares on the open market at artificially-inflated prices, damaging eHealth.

117.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

118.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about eHealth not misleading.

119.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by eHealth. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and

to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

120.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

121.   Plaintiffs on behalf of eHealth have no adequate remedy at law.

## COUNT V

**Against Defendants Flanders, Yung, and Francis for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act**

122.   Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.   Defendants Flanders, Yung, and Francis are named as defendants in the related Securities Class Action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

124.   eHealth is named as a defendant in a related securities class action that alleges and asserts claims arising under Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If eHealth is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

125.   As officers, directors and otherwise, defendants Flanders, Yung, and Francis had the power or ability to, and did, control or influence, either directly or indirectly, eHealth's general affairs, including the content of its public statements, and had the power or ability to directly or

indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

126.    Defendants Flanders, Yung, and Francis are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

127.    Defendants Flanders, Yung, and Francis have damaged the Company and are liable to the Company for contribution.

128.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of eHealth, demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of eHealth and that Plaintiffs are adequate representatives of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to eHealth

D.    Directing eHealth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect eHealth and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a proposal to strengthen eHealth's oversight of its disclosure procedures;

4.    a provision to control insider transactions; and

1         5.  a provision to permit the stockholders of eHealth to nominate at least four candidates

2  for election to the Board;

3       E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state

4  statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

5  on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as

6  to assure that Plaintiffs on behalf of eHealth have an effective remedy;

7       F.      Awarding to eHealth restitution from defendants, and each of them, and ordering

8  disgorgement of all profits, benefits, and other compensation obtained by the defendants;

9       G.      Awarding to Plaintiffs the costs and disbursements of the action, including

10  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

11       H.      Granting such other and further relief as the Court deems just and proper.

12                              **<u>JURY DEMAND</u>**

13       Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

14  DATED: December 9, 2022

                             */s/ Pavithra Rajesh*

15                              GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay

16                              Pavithra Rajesh
1925 Century Park East, Suite 2100

17                              Los Angeles, CA 90067
Telephone: (310) 201-9150

18                              Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

19                              Email: prajesh@glancylaw.com

20

21                              Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor

22                              New York, NY 10151
Telephone: (212) 935-7400

23                              Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

24                              THE BROWN LAW FIRM, P.C.
Timothy Brown

25                              767 Third Avenue, Suite 2501
New York, NY 10017

26                              Telephone: (516) 922-5427
Facsimile: (516) 344-6204

27                              Email: tbrown@thebrownlawfirm.net

28                              *Co-Lead Counsel for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE LAW OFFICES OF FRANK R. CRUZ
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
Email: fcruz@frankcruzlaw.com

THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 266-4684
Email: lrosen@rosenlegal.com

*Additional Counsel for Plaintiffs*

## **VERIFICATION**

I, Yacob Chernet, do hereby verify that I am a holder of common stock of eHealth, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Consolidated Stockholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 12/7/2022

DocuSigned by:

_____
31A632B5CD804EF...
Yacob Chernet

## **VERIFICATION**

I, Dharmender Badwal, do hereby verify that I am a holder of common stock of eHealth, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Consolidated Stockholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  12/9/2022

_Dharmender Badwal_
_____
Dharmender Badwal